13023

FARROW v. FIRST NATIONAL COMPANY

(155 S. E., 736)

*Messrs. Carlisle, Brown & Carlisle* and *W. B. McGowan,* for appellant,

*Messrs. Price & Poag,* for respondent,

November 11, 1930.

The opinion of the Court was delivered by MR. ACTING ASSOCIATE JUSTICE MENDEL L. SMITH.

This action was commenced on the 1st day of February, 1927, against the Tryon Development Company and the First National Company, a non-resident corporation of the State of North Carolina, for the cancellation and surrender of a note for $3,500, executed and delivered to the Tryon Development Company for the balance of the purchase price of five lots at Lake Lanier, in Greenville County, and also for judgment for the sum of $500 and interest represent-

ing the payment of a part of the purchase price of said lots, upon the ground that the contract between the parties had been breached and that such part of the purchase money paid had been secured under fraudulent misrepresentations by the company.

The defendant, Tryon Development Company, became insolvent and went into the hands of a receiver on the 4th day of February, 1927, and no answer having been filed in its behalf, judgment by default upon proper proof was taken against it, and it is not a party to this appeal.

It appears from the undisputed testimony submitted in the case that the Tryon Development Company was organized on the 1st day of March, 1925, and was one of the many mountain land development companies that operated as a result of "boom" conditions during the years 1924 and 1925. It purchased a tract of land of about seven hundred acres and began a development of what is known as the Lake Lanier property.

Through the activity of one of the sales agents of the company, the respondent, Mrs. Mary H. Farrow, a woman of the highest character, became interested in and purchased the lots referred to. On the 23rd day of June, 1925, she executed a contract for the purpose of these lots for the sum of $4.000 of which purchase price $250 was paid in cash and two notes given for the remaining part thereof, one of which was for $250, payable on the 1st day of November, 1925, and the other for the sum of $3,500, the note here in question, payable on the 10th day of April, 1926.

The contract of sale between the parties provided that these lots would have a minimum frontage of three hundred and fifty feet and if a survey made the lots undesirable the money would either be refunded or be made applicable to other lots. At this time the survey had not been completed but the representations to Mrs. Farrow were certain and definite that the lots would face upon the lake and surmount a beautiful knoll. The lots were fan-shaped, and the company

represented that it would locate a boulevard between the lake and her property.

Before the maturity of the first note, the development company presented to her a deed, but the description therein set out did not embrace the property purchased and she refused to accept it. In the fall of 1925 she went to Lake Lanier and found her lots inaccessible, but was then given the assurance by the company that the work was progressing and that later on she would be able to approach her lots. In November, 1925, she paid the $250 note, giving the money to the development company. She later received this note from the appellant with an indorsement of payment.

It appears that after the payment of this note the development company completely changed the location of the boulevard and laid it out to the rear of her property, leaving her lots about two hundred and fifty or three hundred yards from the road and approachable therefrom by a narrow alley. Subsequent to the payment of this note, the development company sent another deed to the respondent with mortgage attached for her execution to secure payment of the balance of purchase price, but observing that the description in this deed showed that the boulevard had been located in the rear of her house, she refused to accept it or to execute the mortgage.

Thereafter, in December, 1925, the respondent made demand upon the general treasurer of the company, Mr. W. M. Hester, for the refund of her money or a deed to more desirable property, as provided for in the contract of sale. She had received no notice up to this time that the note in question was held by the appellant, First National Company. Apprehending that she would have no serious trouble in the matter, she deferred any definite action until August, 1926, at which time she went to Tryon and repeated her demand either for a refund of money or a deed to more satisfactory lots, to which the company replied, as it had to her first demand, that it would not make the refund or give a

deed to more desirable lots, and she was informed at that time that her note was in the hands of the respondent. She immediately got in communication with the president, Mr. J. O. Cobb, of the First National Company, and inquired of him if his company held the note in question and was informed by him that the company did not hold the note, but that it had been returned to the development company with other papers. She then placed the matter in the hands of her attorneys, who, after considerable fruitless correspondence with the appellant, some of which was introduced in evidence, brought this action for the purpose indicated.

The appellant accepted service of the summons and complaint on the 24th day of February, 1925, and filed an answer in which it alleged that pursuant to an agreement with the Tryon Development Company it came into possession of the note in October, 1925, long before its maturity, and that it is the holder thereof for value without any notice of any defect therein or any defenses thereto. At the reference, by way of supplemental answer, it also alleged that it had subsequently bought the note in question at a sale thereof on the 18th day of May, 1927, and then owned it in its own right.

The case was referred to the Master in Equity of Greenville County, who in a very able and comprehensive report recommended that the relief sought by the plaintiff be granted. On numerous exceptions to the report of the Master, the Hon. T. J. Mauldin sustained the Master's findings of fact and filed a decree in which he ordered the note in question canceled and allowed plaintiff judgment against the development company for the amount demanded. This appeal, is from this decree, and while it presents a number of .exceptions for the consideration of the Court, the only issue arising is whether the appellant held the note in question as a *bona fide* holder thereof for value before maturity and without notice of any defect therein or defenses thereto.

The rule in this State is well settled that the findings of fact by the Master, concurred in by the Circuit Judge, will not be disturbed by this Court unless it it shown that such findings are without any evidence to support them or are against the clear preponderance of the evidence *(Barrett v. Cochran,* 11 S. C., 29; *Youmans v. Youmans,* 128 S. C., 31, 121 S. E., 674; *Cohen v. Goldberg,* 144 S. C., 70, 142 S. E., 36; *Kaminski Hardware Company v. Holden Trunk & Bag Company,* 150 S. C., 244, 147 S. E., 874), and the burden is upon the appellant to establish this fact.

The controlling inquiry in the case, therefore, is whether the appellant has met this requirment in regard to the issue presented for our determination.

As far as the relative rights of the respondent and the Tryon Development Company are involved, it is beyond question that there has not only been a total failure of consideration for the notes in question, but facts and circumstances adduced in evidence that tend strongly to support the inference of a fraudulent breach of the contract, the legal force of which was dependent upon the proper performance by the company of its imposed obligations in which it completely failed. Apparently, not one of its representations was met, and therefore it is quite evident that the right to a cancellation of this note, and judgment for the sum of $500 with interest from the 1st day of November, 1925, are clearly established so far as the Tryon Development Company is concerned.

The title to the note in question being thus clearly defective in the alleged negotiating company, the concluding question is whether the appellant was a holder thereof in due course, and the burden is on it to show that it was such a holder.

Section 3710, Vol. 3, of the Civil Code 1922 (Section 59, Negotiable Instruments Act), provides:

"Every holder is deemed *prima facie* to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as a holder in due course. But the last-mentioned rule does not apply in favor of a party who became bound on the instrument prior to the acquisition of such defective title."

The rule is thus well stated in the case of *Bank v. Stackhouse,* 91 S. C., at page 461, 74 S. E., 977, 979, 40 L. R. A. (N. S.), 454:

"While the authorities elsewhere are not entirely in accord, our own cases and the greater weight of authority in other jurisdiction agree that when the defendant shows fraud or illegality in the inception of the paper, or that it was lost by or stolen from the owner, the presumption which is raised by its mere possession is overcome, and the burden then shifts to the holder to show that he acquired it in good faith, for value, before maturity, in the usual course of business, and under circumstances creating no presumption that he knew of the fraud or other defect in title."

While it is essential that the Courts, in accordance with settled and long-sanctioned principles of law and equity, when the latter are properly invoked, sustain the title to, and carefully guard the legal status of, the negotiable instrument, for the convenience and necessities of the modern commercial world, whose methods and customs are so fixed and channels of trade so established than an ill-considered or reactionary disturbance of the underlying principles would have a more or less far-reaching and somewhat disastrous effect; yet, this whole transaction on the part of the development company and the appellant, as the Master well observes in his most elaborate and satisfactory report, "is permeated with inconsistencies and contradictions of such a glaring nature" as to afford strong

and controlling inferences against the integrity of appellant's title to this note and to deny to it the wholesome protection afforded by the law to such instruments when held in good faith.

This observation is fully supported by a brief consideration of some of the significant phases of the transaction as established by the evidence to which our attention will now be directed.

In order to finance the development of the Lake Lanier property for residential purposes, the development company determined to issue certain collateral gold notes and gold bonds of prescribed form and varied denominations. The appellant, pursuant to a very voluminous agreement, designated as an indenture of trust, became the trustee of the development company, to sell and dispose of these notes and bonds, and the latter was to deliver to the trustee all of its purchase money-notes, mortgages, and property as collateral. This agreement provides that no holder of a collateral note or bond shall have any recourse except against the development company and the collateral deposited with the trustee. This exemption from liability naturally resulted from a provision in the trust agreement to the effect that the trustee would not deliver to the purchaser any collateral gold note or bond except when the development company had placed with it purchase money notes amounting in the aggregate to 200 per cent. of the aggregate principal amount of the collateral gold notes and bonds. It was also required to furnish financial statements from a reliable credit company that each obligor was financially able to pay his or her note. The agreement further provides that the trustee shall be paid for its services and could resign at any time upon a reasonable notice. It is also beyond question that the appellant did not part with anything of value in these transactions. The appellant was therefore, under these stipulations and others to which reference is unnecessary, merely a hold-

ing company without any legal liability in any way upon any of said lots or bonds.

This trust agrement also specifically provided that "each and every purchase money note pledged with the trustee shall be secured by mortgage or deeds of trust to be deposited with the trustee, duly recorded in the county or counties in which the land is situated, and that the amount of said purchase money obligation is not more than 75% of the sale of said land."

It is not questioned that the note of the respondent in this case was not secured by mortgage or deed of trust, was for 87½ per cent. of the sale price, and was not the kind of collateral the appellant could approve for the protection of the purchasers of the gold bonds and notes, in plain violation of the trust agreement, and the record does not show that the appellant had any dealings or business transactions with the development company except under the agreement.

The appellant could not, therefore, escape notice of the fact that the transaction in which the alleged transfer was made was entirely irregular, in that the note was in excess of the 75 per cent. of the purchase price of the land, and was not the character of purchase money security it was required to take or certify in dealings with its customers who became the purchasers of the gold bonds and notes provided for in the agreement.

With regard to the definiteness of possession and the date of the alleged transfer of the note, an uncertainty and confusion exist that are not generally incident to the *bona fide* course of such securities, to say the least, in any business office with any attention at all to correct and orderly business methods and records.

It appears, as already stated, that in August, 1926, the respondent made inquiry of the appellant as to its possession of her note maturing April 10, 1926, and she was informed that it had no such note but had returned it with the other

papers. On the 18th day of August, a day or two after this telephone conversation, an official of the appellant in charge of collections wrote respondent that the company did have the note and had received it "about last January," 1926. Another official, the assistant treasurer, testified that the note was received from the development company on "October 14, 1925." On the 20th day of August, 1926, the collection agent wrote Mrs. Farrow that the note had been received "during the past winter," with the word· "winter" written with pen over the typewritten word "month."

In regard to the date of maturity of the said note, perhaps, a more surprising confusion developed. Two officials of the appellant stated that they had incorrectly entered in a card index system the date of maturity as the 10th of September, instead of the 10th of April, 1926, claiming that the letters "Apr." a mere notation in one corner of the note, was so indistinct as to be taken evidently for "Sept."; but the body of the note contained the correct date, which could have been observed by the officials of the company in the exercise of even the slightest care.

In letters of the 18th and 20th of August, respectively, an official of the company refers to the date of the maturity as the 10th of April, yet on the 30th of August and the 17th of September, 1927, letters by the same official were correctly addressed to respondent referring to the maturity of the note as the 10th of September, 1926.

The correct address of the respondent was written in her own handwriting under her signature on the note, and there is no reason that any letter addressed to her should have gone astray or have been returned and it is significant to observe that after the telephone conversation with the president of the company, on the 17th day of August, 1926, she experienced no difficulty in receiving letters addressed to her at Greenville, S. C. Yet, in a letter to respondent's attorneys, of date September 20, 1926, this same official states that he had written her upon several occasions all of which letters

had been returned. He testified in an attempted explanation of this statement by saying that he had reference to letters written to appellant in November and October, 1925, but it is apparent that there was no necessity for sending her a notice at that time in regard to the payment of a note that was not due until the 10th of April of the succeeding year, 1926, or even according to the card index notation was not due until September of the next year, 1926. The testimony shows that it was the custom to send out such notices about ten days before the day of maturity, but none with regard to this note was sent out in April, 1926.

In the foregoing letter, this officer also states without the slightest suggestion of doubt or qualification that respondent "desired an extension of her note maturing the tenth of April," and "that we agreed to accept a renewal note for this amount purely as an accommodation to the Tryon Development Company," and that "the note which you mention as maturing as of September tenth is a renewal note for the one which matured in April"; yet, as a matter of fact, the testimony shows beyond a shadow of a doubt that no such renewal was sought or desired by the respondent, and that the note in question is not a renewal note. In an almost frivolous attempt to explain away this palpable misstatement of fact, this official testified that he was only "under the impression that someone told me that Mrs. Farrow desired an extension—cannot recall, have no means of recalling other than the impression."

It is almost inconceivable that so much uncertainty, confusion, and contradiction should exist in the affairs of any business concern in reference to the transfer, date of maturity, possession, and method of handling of a security of this extent if it pursued the ordinary and judicially-protected journey of immunity. These facts and circumstances, as well as others that need not be mentioned, certainly afford evidence so strong in inference and probative force as to give

ample support to the concurring conclusions of the Master and the Circuit Judge.

The final inquiry is whether the ownership of the note, as the purchaser thereof at its sale on the 18th of May, 1927, is available to the appellant as an innocent purchaser for value and without notice. As the sale under the provisions of the trust agreement occurred several months after this action was brought and long after appellant had full notice of the rights and claims of respondent, it cannot claim the protection of an innocent purchaser for value without notice.

All the exceptions have been duly considered by the Court and overruled,

It is therefore the judgment of the Court that the judgment of the Circuit Court be and the same is hereby, affrimed.

MESSRS. JUSTICES COTHRAN, BLEASE, STABLER and CARTER concur.