16313

PHIPPS v. PHIPPS

(57 S. E. (2d) 417)

*Messrs. F. A. Thompson and J. Reuben Long,* of Conway, *for Appellant,*

*Messrs. Epps & Abbott,* of Conway, *and L. B. Dawes,* of Loris, *for Respondent,*

January 31, 1950.

TAYLOR, Justice.

Appellant in this action sought to have annulled and declared void, on the ground of duress, a marriage entered into with the respondent, Ethel Louise Phipps, on September 9, 1947.

The matter was referred to Honorable J. K. Dorman, Master for Horry County, for the purpose of having him take the testimony and report the same, together with his findings, both of law and fact. After taking the testimony, the Master made his Report, dated December 17, 1948, in which he recommended that the Complaint be dismissed.

In due time, the appellant filed his exceptions to the Report of the Master, and the matter was argued before his Honor, Judge G. Duncan Bellinger, who rendered his Decree, dated April 25, 1949, confirming the Report of the Master, and overruling the exceptions thereto.

Appellant and respondent first met each other in September, 1946. From that time they saw each other regularly about three times a week up until March or April when the visits were reduced to approximately one every two weeks. In November, 1946, they became engaged and planned to be married the first of the year.

In January of 1947 appellant induced the respondent to have improper relations with him, which resulted in her becoming pregnant and giving birth to a child on October 15, 1947.

When the respondent realized her condition, she informed the appellant, who stated that he would marry her and continued to promise that he would up until August 22nd, when he informed her that he was not going to do so.

The respondent's parents learned of her condition on September 7, 1947. That night the respondent and her parents rode into Conway and tried to find the appellant, but were unable to do so. The following morning, the respondent's

father, Mr. George Spivey, and two of her brothers went to the home of the appellant's sister with whom he lived. Upon being informed of the situation, appellant attempted to run, but was restrained by Mr. Spivey, who held him by the belt. Upon being questioned about a prior statement to respondent that he had procured a marriage license, he denied having done so and it was then that appellant, according to his testimony, was placed in Mr. Spivey's car and they proceeded to the Courthouse, whereupon Mr. George Spivey went into the Courthouse and returned shortly, when the following transpired, according to appellant's testimony:

"Q. Goes in where? A. In the courthouse. He comes back out and he said: 'You are a little bit smarter than I thought you were.' He was speaking to me. Preston said: 'You know what we should do with him?' I said: 'What, shoot me?' He said: 'That's exactly right.' Mr. George said: 'This is too good for him. We should take him to the river and tie a rock around his neck and toss him in.'"

It certainly doesn't sound reasonable that appellant was actually in fear of being injured or he would never have suggested that he be shot. Further, the father of respondent, after returning to the car from the Probate Judge's office told appellant that he was correct in stating that he had not procured a marriage license and that he was going to have him arrested and went back into the courthouse. Appellant with respondent and three of her brothers were in the car and it was at this time that Mr. Preston Spivey, one of the brothers, proposed that the appellant and respondent get married, and he would pay the cost of a divorce if appellant stayed with respondent until the child was born.

As to this, appellant testified as follows:  ·

"Q. How did you finally agree to go to the Probate Court and get a license? A. We agreed that if he would put it in writing, that if I would marry her, I wouldn't have to live with her and that as soon as the child was born, he would

pay for the divorce, all doctor bills and hospital bills and support her.

"Q. You and which one agreed to that? A. Preston.

"Q. Was Mr. Spivey, Sr., there? A. Yes, sir.

"Q. Was Miss Louise there? A. Yes, sir.

"Q. Did she agree to that? A. Yes, sir.

"Q. Mr. Spivey agree to it? A. Yes, sir.

"Q. When were you to put that in writing? A. The next morning before I got married.

"Q. You agreed to that? A. Yes, sir."

Appellant and respondent then proceeded to the Probate Judge's office alone and applied for a marriage license. The testimony further shows that while they were parked at the courthouse all of the occupants left the car except appellant and respondent and that appellant then went to the drug store and procured soft drinks for himself and respondent and were sitting in the car. When the others returned, they then proceeded to appellant's home where he went into the house alone and got his clothes. There was a telephone there but he made no attempt to call for help but rejoined the party in the car and accompanied them to the respondent's home. Being questioned as to his intent at this time, appellant said:

"Q. Isn't it a fact, that having made this agreement, you intended to stick up to it like a gentlemen? A. If they had done like they said they would do.

"Q. You are willing to go ahead and carry out your part of the agreement if they had done what they said they would do? A. That's right.

"Q. That is, put it in writing? A. That's right.

"Q. You expected to carry out the agreement if they had carried out their part of the agreement? A. If they had carried out their part of the agreement.

"Q. You expected to carry out your part of it? A. Yes, sir."

It appears from the testimony that when they all went back to the home of Mr. George Spivey, several of the men, if not all of them, left the house, and the plaintiff remained at the house and slept in a room by himself that night, with the windows open.

It further appears that the sister of the plaintiff, Miss Ethel Phipps, together with her friend, Miss Lelia Mishoe, drove out to the Spivey home that afternoon and there was quite a lot of conversation among the parties, and that the plaintiff went out and got in the car with Miss Lelia Mishoe and talked to her for some time. These facts are cited for the purpose of showing that if the plaintiff had wished to run away, he had ample opportunity for doing so. Although Miss Ethel Phipps thought that the plaintiff was being restrained of his liberty, he, himself, when asked if, at that time, while Miss Phipps was at the Spivey home, he still intended to carry out the agreement, testified that he did.

It is therefore seen that appellant was willing to comply with the agreement provided that it be reduced to writing before the marriage. This is strong evidence that he was exercising his own will and not being coerced.

The next morning appellant accompanied respondent's father to the office of a Mr. Cartrette where the agreement was to be reduced to writing. Not finding Mr. Cartrette in, Mr. Spivey left the appellant there alone. Returning some time later and finding that Mr. Cartrette had not yet arrived at his office, they proceeded to the courthouse, Mr. George Spivey going in while appellant remained outside with others. Shortly thereafter, Mr. Spivey came out, accompanied by Mr. Lonnie D. Causey, a reputable member of the Conway Bar. Mr. Causey suggested that the thing for appellant to do would be to go ahead and get married and then in ten or twelve days come in and get "divorce papers." The original agreement was that the appellant, after the marriage, would return to the Spivey home and remain until the child was born, but, at the suggestion of Mr. Causey, the agreement

was not put in writing as he informed them that such a contract would not be binding. Appellant and respondent then decided to have the marriage ceremony performed and each to go separate ways, whereupon they proceeded to the office of the Probate Court alone where the marriage ceremony was performed by the Probate Judge. Appellant then escorted the respondent back to the car and returned to his home, while she returned to the home of her father.

If duress, as is contemplated by the law, was at any time during the negotiations exercised by respondent or her family, it must clearly have dominated throughout the transaction to such an extent that appellant could not and did not act as a free agent. The violence or threats must have been of such a nature as to inspire a great fear of bodily harm. There is ample evidence to the contrary in the case at bar. *Campbell v. Moore,* 189 S. C. 497, 1 S. E. (2d) 784.

The Master in his Report to the Circuit Court recommended that the complaint be dismissed. Upon exceptions being taken thereto, the matter was heard in the Court of Common Pleas by the Honorable G. Duncan Bellinger, who, in his Decree, dated April 25, 1949, confirmed the findings of the Master and overruled all exceptions.

It is well-settled law that the findings of fact concurred in by the Circuit Judge will be sustained by this Court unless it is found that they are against the clear preponderance of the evidence or without any evidence to sustain them. *Cohen v. Goldberg,* 144 S. C. 70, 142 S. E. 36; *Kaminski Hardware Co. v. Holden Trunk and Bag Co.,* 150 S. C. 244, 147 S. E. 874; *Farrow v. First National Co.,* 158 S. C. 435, 155 S. E. 736; *Carolina Savings Bank v. Ellis,* 174 S. C. 69, 176 S. E. 355, 366; *Alderman v. Alderman,* 178 S. C. 9, 181 S. E. 897, 105 A. L. R. 102; *Ulmer v. Bookhart,* 178 S. C. 87, 182 S. E. 162; *First Carolina Joint Stock Land Bank of Columbia v. Knotts,* 183 S. C. 68, 190 S. E. 114; *Riley v. Berry,* 189 S. C. 4, 199 S. E. 866.

We are of the opinion that the findings of the Master, concurred in by the Circuit Judge, are amply sustained by the evidence. Therefore, all exceptions should be overruled and it is so ordered.

Judgment affirmed.

BAKER, C. J., and FISHBURNE, STUKES and OXNER, JJ., concur.