Mrs. Myrtis Ioannis MPILIRIS

v.

HELLENIC LINES, LIMITED, Transpacific Carrier Corp., and Universal Cargo Carriers.

Civ. A. No. 67–H–29.

United States District Court,
S. D. Texas,
Houston Division.

May 15, 1969.

Supplemental Opinion July 16, 1969.

Findings of Fact and Conclusions of Law Aug. 31, 1970.

Arthur J. Mandell, Mandell & Wright, Houston, Tex., for plaintiff.

Carl O. Bue, Jr. and Ken Kuykendall, Royston, Rayzor & Cook, Houston, Tex., for defendants.

## MEMORANDUM AND ORDER

SEALS, District Judge.

The plaintiff, Mrs. Myrtis Ioannis Mpiliris, a citizen of the United States, instituted this suit under the Jones Act (46 U.S.C. § 688), or, alternatively, under the general maritime law of the United States, including the New York Wrongful Death and Survival Statutes, to recover any damages to which she may be entitled by reason of the fatal personal injuries suffered by her husband, Ioannis Mpiliris, a Greek citizen, on or about March 31, 1966, while he was working upon the SS HELLENIC DESTINY in the Port of New York.

The case is presently before the Court upon the motion of the defendants to dismiss and to decline jurisdiction or alternatively to strike the causes of action under American law on which the plaintiff bases her case. In support of this motion the defendants rely primarily upon the following propositions:

(1) that neither the Jones Act nor the general maritime law, including the New

York Wrongful Death and Survival Statutes, are applicable; and

(2) even if one of the above jurisdictional grounds is found to exist this court should decline to exercise such jurisdiction because

(a) a Greek judgment has already been entered which adopted the settlement agreement of the defendants herein with all the proper beneficiaries under Greek law and this judgment should be accorded preclusive effect as to this plaintiff, and

(b) the undeserving nature of the plaintiff's claim presents an appropriate instance wherein the court should, in the proper exercise of its broad discretionary powers, refuse to allow the plaintiff to sue in this court.

## I.

### SUMMARY OF FACTS

Ioannis Mpiliris was a Greek seaman living in Greece and serving as a member of the crew of the SS HELLENIC DESTINY, a Greek flag vessel operating between the middle East, Greece and the United States. His contract of employment provided that Greek law and the Greek Collective Bargaining Agreement were to apply as between the employer and the crew, and that all claims arising out of this employment contract were to be adjudicated exclusively by Greek courts.

Ioannis Mpiliris arrived at Houston on the SS HELLENIC DESTINY on or about March 12, 1966, and was married to the plaintiff before a Justice of the Peace the next day. The defendant asserts that this was an arranged marriage whereby Ioannis Mpiliris could gain entry into this country on a preferred basis. Ioannis Mpiliris then sailed to New York aboard the SS HELLENIC DESTINY and suffered fatal injuries while on said ship in the Port of New York.

The SS HELLENIC DESTINY is owned jointly by defendant Transpacific Carriers Corp. and defendant Universal Cargo Carriers, Inc., both of which are Panamanian corporations, but it is registered in and flying the flag of Greece. Transpacific Carriers Corp. and Universal Cargo Carriers are both wholly owned by the Defendant Hellenic Lines, Ltd., a Greek company, approximately 95 per cent of whose stock is held by a Greek citizen, Pericles Callimanapoulos, who is also a permanent resident alien of the United States. The ship is controlled from the principal office of the Hellenic Lines in New York.

After the death of Ioannis Mpiliris, the decedent's mother instituted suit in the Greek courts. Because Mrs. Myrtis Ioannis Mpiliris was not married to the decedent in a Greek Orthodox Church, she has no legal standing to sue in Greek courts as the decedent's widow. Accordingly, a Greek judgment was entered in favor of the decedent's mother as she was the only legal beneficiary under Greek law. But the plaintiff, Mrs. Myrtis Ioannis Mpiliris, asserts that this Greek judgment is entitled to no preclusive effect as to her suit under the law of this country against the same defendants.

## II.

The applicability of the Jones Act to alien seamen serving aboard foreign vessels has never been a model of clarity. In Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) the United States Supreme Court prescribed the method by which the courts should resolve the question of whether to apply the act or not. The Supreme Court held in that case that when foreign seamen are involved, whether the Jones Act or some foreign law should be applied is to be determined on a "points of contact" basis. And conflicts between competing laws are to be avoided or resolved by "ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved." *Id.* 345 U.S. at 582, 73 S.Ct. at 928. After the various points of contact are determined, the law of the nation which has

the most interest in the transaction should be applied.

In *Lauritzen* the Supreme Court set forth seven factors which taken alone or in combination should be considered to determine whether United States law is applicable: (1) the place of the wrongful act, (2) the law of the flag, (3) the allegiance or domicile of the injured party, (4) the allegiance of the defendant shipowner, (5) the place and terms of the contract, (6) the relative inaccessibility of the foreign forum, and (7) the law of the forum.

If in a "particular case something between minimal and preponderant contacts" are found the Jones Act is applied. Bartholomew v. Universe Tankships, Inc., 263 F.2d 437, 440 (2d Cir.) cert. denied, 359 U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1030 (1959). "The test is that substantial contacts are necessary. And while one contact such as the fact that the vessel flies the American flag may alone be sufficient, this is no more than to say that in such a case the contact is so obviously substantial as to render unnecessary a further probing into the facts." *Id.* at 439.

■ However, it is not altogether clear what contacts or combinations of contacts justify application of American law since *Lauritzen* did not specify which possible combinations of the seven factors would cause the Jones Act to govern the case. These are indeed mirky waters for the seven factors of *Lauritzen* are neither exclusive nor immutable. [*See, e. g.,* Pavlou v. Ocean Traders Marine Corp., 211 F.Supp. 320, 325 (S.D.N.Y. 1962)].

Normally this court would be compelled to review the growing body of adjudicated factual situations in this area to determine whether the present combination of operative factors is sufficient to support the granting of Jones Act relief. But in the present case the necessity for analyzing the cases construing and applying *Lauritzen* has been obviated by a very recent decision of the Court of Appeals for the Fifth Circuit. In Hellenic Lines, Ltd. v. Rhoditis (5th Cir. 1969), 412 F.2d 919, the Fifth Circuit was presented with the question whether the Jones Act applied to a case with operative facts identical to those of the present case.

■ In *Rhoditis* the plaintiff, a Greek seaman, was injured in a port of this country (New Orleans) while aboard a ship registered in and flying the flag of Greece and owned under an arrangement identical with that in the present case, involving the same defendants with the exception of the Transpacific Carrier Corp., which was not joined as a party in *Rhoditis*. The Fifth Circuit, finding that the vessel "was for all commercial purposes owned and operated by a United States domiciliary," held the Jones Act applicable to the facts of that case. Insofar as the applicability of the Jones Act to this case is concerned, absent compelling countervailing factors, this court is quite clearly bound by the decision of the Fifth Circuit in *Rhoditis* by reason of the factual identity of the two cases. And as the present case is a death action brought by the decedent's wife who is a *U. S. citizen,* an even stronger case exists in favor of applying American law.

As it has been determined that the laws of the United States apply to the facts of this case, the defendants cannot avoid their duties and liabilities arising under the Jones Act by contracting with Ioannis Mpiliris for the application of Greek law. Pavlou v. Ocean Traders Marine Corp., 211 F.Supp. 320 (D.C.N.Y.1962); Greenberg v. Panama Transport Co., 185 F.Supp. 320 (1960), vacated on other grounds, 1 Cir., 290 F.2d 125, cert. den., 368 U.S. 891, 82 S.Ct. 143, 7 L.Ed.2d 88 (1961); Farmer v. Standard Dredging Corp., 167 F.Supp. 381 (D.C.Del.1958).

■ Under the general maritime law a seaman's surviving heirs and representatives have no remedy against the individual or thing which causes his death, absent applicable statutory provisions to the contrary. However, where

state statutes have been enacted which provide for death actions, these statutes have been utilized and upheld as implementing the general maritime law and recovery is granted under these statutes. Hess v. United States, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960); The Hamilton, 207 U.S. 398, 28 S.Ct. 133, 52 L.Ed. 264 (1907). Thus, where death has occurred on navigable waters within the territorial jurisdiction of a state, as in the present case, the state's wrongful death statutes and survival statutes are operative and given effect in admiralty. And some states have incorporated into their laws the general maritime law concepts including unseaworthiness. (*See, e. g.,* Vassallo v. Nederl-Amerik Stoomv Maats Holland, 162 Tex. 52, 344 S.W.2d 421 (1961)).

■ But the New York statutes can have no application in the present case and, additionally, the question whether New York has incorporated the concept of seaworthiness into these statutes is moot. The reason is that the Jones Act established a rule of general application and covers the entire field of liability for the death of a seaman. It is paramount and exclusive and supersedes all state statutes which might apply. Lindgren v. United States, 281 U.S. 38, 50 S.Ct. 207, 74 L.Ed. 686 (1930). And *Rhoditis* clearly extends the reach of the Jones Act to the facts of this litigation. See Gillespie v. U. S. Steel Corp., 6 Cir., 321 F.2d 518, aff'd, 379 U.S. 148, 85 S.Ct. 308, 13 L.Ed.2d 199 (1963).

### III.

The defendants have submitted a certified translation of a judgment entered January 21, 1969, by a Greek Court adopting a settlement agreement between Maria Biliris, the decedent's mother and plaintiff before the Greek Court, and the defendants Transpacific Carrier Corp. and Universal Cargo Carriers, Inc. The defendants assert this judgment not only releases all parties to the Greek case but also extends to all causes of action arising out of the same transaction which might be urged American law or any other foreign law, convention or legislation.

■ Doubtless influenced by interstate practice as shaped by the constitutional compulsions of due process and full faith and credit, courts of this country ordinarily recognize and enforce an internationally foreign judgment if the rendering court is determined to have possessed adjudicatory jurisdiction in the international sense (that is, it was appropriate for this country to adjudicate this particular dispute). (*See, e. g.* Ritchie v. McMullen, 159 U.S. 235, 16 S.Ct. 171, 40 L.Ed. 133 (1895) and utilized fair procedures (*see, e. g.* Wuchter v. Pizzutti, 276 U.S. 13, 48 S.Ct. 259, 72 L.Ed. 446 (1928).

■ The proceedings in the Greek Court appear to have been fair and regular, nothing in the record suggesting otherwise. Substantial contacts existed with Greece, making the Greek Court an appropriate forum to adjudicate the dispute presented to that Court.

Thus it appears that the Greek judgment is entitled to recognition in this country and if foreign adjudication is to be recognized at all, the natural minimum of preclusive effect to be accorded is that the original parties are bound by the precise holding of the foreign judgment. Hilton v. Guyot, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95; *see,* Restatement (Second) of Conflicts of Laws § 98 (Proposed Official Draft 1967). However, the plaintiff before this court was not a party to the Greek adjudication. Thus the central question raised by the defendants' reliance on the Greek adjudication is whether by reason of this Greek judgment any preclusive effect should be imposed on the plaintiff, a third party who was not a party to the original suit.

American law probably accords broader conclusive effects to domestic judgments than does any other legal system. *See, e. g.,* Americana of Puerto Rico, Inc. v. Kaplus, (3rd Cir. 1966) 368 F.2d 431, cert. den., 386 U.S. 943, 87 S.Ct. 977, 17 L.Ed.2d 874 (1967); Szantay v. Beech Aircraft Corp., 349 F.2d 60 (4th Cir.

1965); Wise v. Berman, 282 F.Supp. 282 (D.C.Fla.1967); Abele v. A. L. Dougherty Overseas, Inc., 192 F.Supp. 955 (D.C.Ind.1961). The economic and cultural relationships within our closely bound federal system tend to be closer, and as a result the practical arguments supporting conclusive effect for the domestic judgments of sister states in this country are stronger. Also, shared traditions and experience and the close similarity of procedures and standards help reduce doubt about the quality of justice represented by a judgment.

■■ Yet even under the law of the United States the use of a prior judgment against a person who was not a party to the original litigation is generally prohibited because he did not have a fair chance to litigate the matter. In American res judicata practice, a prior judgment generally bars subsequent suits on the same cause of action and renders the judgment conclusive only as between the parties to the prior case. *E. g.*, Glass v. U. S. Rubber Co., 382 F.2d 378 (10th Cir. 1967); Mid-Continent Cas. Co. v. Everett, 340 F.2d 65 (10th Cir. 1965); Lutes v. United States District Court for Western District of Okla., 306 F.2d 948 (10th Cir. 1962), cert. denied, 371 U.S. 941, 83 S.Ct. 320, 9 L.Ed.2d 275 (1962). Strong v. Aetna Cas. & Surety Co., 52 F. Supp. 787 (D.C.Tex.1943); Lowe v. Ragland, 156 Tex. 504, 297 S.W.2d 668 (1957).

There are several exceptions to this doctrine. A judgment may be asserted against a nonparty if:

(1) the nonparty was in "privity" with the actual parties to the first litigation (the nonparty is so identified in interest with a party to the former litigation that he represents the same legal right in respect to the subject matter involved) [*e. g.*, Jefferson School of Soc. Science v. Subversive Activities Control Bd., 118 U.S.App.D.C. 2, 331 F.2d 76 (1963); Glass v. U. S. Rubber Co., 382 F.2d 378 (10th Cir. 1967); Smith v. Bush, 312 F.2d 131 (5th Cir. 1963); Canaan Products, Inc. v. Edward Don & Co., 388 F.2d 540 (7th Cir. 1968)].

(2) he controlled the earlier action [*e. g.*, Thaxton v. Vaughan, 321 F.2d 474 (4th Cir. 1963); Manville Boiler Co. v. Columbia Boiler Co., 204 F.Supp. 385 (D.C.Pa.1962)];

(3) his interests were represented by a party to the prior action [*e. g.*, Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968); Smith v. Alleghany Corp., 394 F.2d 381 (2nd Cir. 1968); Simon v. Maryland Cas. Co., 353 F.2d 608 (5th Cir. 1965)]; or

(4) he is the successor in interest to prior parties or their privies [*e. g.*, Rodman v. Rogers, 109 F.2d 520 (6th Cir. 1940); Carey v. United States, 326 F.2d 975, 164 Ct.Cl. 304 (1964); Wise v. Berman, 282 F.Supp. 282 (D.C.Fla.1967)]. *See* Restatement of Judgments §§ 84–92 (1942).

If the case litigated in Greece by the decedent's mother, Maria Biliris, had been litigated in the United States, Mrs. Myrtis Ioannis Mpiliris would fall within none of the above exceptions to the requirement that one must be a party to the prior litigation for the doctrine of res judicata to be applicable. Mrs. Myrtis Ioannis Mpiliris was not represented by a party to the prior case, was not in privity with any of the parties, and as she in no way participated in the case, she obviously exercised no control, directly or indirectly, over the proceedings. Accordingly, had the prior judgment been of a court of the United States the plaintiff, Mrs. Myrtis Ioannis Mpiliris, would not be precluded from asserting her cause of action under the appropriate laws of this country—the Jones Act.

Of course, the prior judgment plead as a defense was litigated before an internationally foreign court and not before a court of the United States. Accordingly, the question is whether in this particular case an internationally foreign judgment should be accorded greater preclusive effect than would be accorded a judgment of a court of this country on the same facts.

It would seem that appealing arguments could be made for a more expan-

sive recognition policy of foreign judgments in situations in which the recognizing jurisdiction has no concern with any of the parties or the underlying transaction. In such a situation there would be little reason to deny the preclusive effects the foreign judgment would have under the laws of the jurisdiction where the judgment was rendered, even if these effects would be broader than the recognizing jurisdiction would accord to its judgments. And these arguments would be more persuasive in a case involving an internationally foreign judgment (a Greek judgment as opposed to a foreign judgment of a sister state) as it may be quite proper in a particular case for entirely different and unrelated legal systems to arrive at different results on identical facts.

■ However, important interests of the United States are inextricably bound to the underlying facts out of which the present suit arose. The substantial contacts of the underlying transaction with the United States and the resulting applicability of the appropriate laws of this country (the Jones Act), previously discussed herein, afford sufficient reason to deny according greater preclusive effect to the Greek judgment than to a similar domestic or sister state judgment. But the facts of this case present an even stronger reason for refusing to bind the plaintiff to the terms of the Greek judgment—the United States citizenship and residency of the plaintiff.

This court is of the opinion, and so holds, that the facts of this case do not justify denying a Jones Act remedy, clearly made applicable to the underlying transaction by the decision of the Fifth Circuit in *Rhoditis*, to Mrs. Myrtis Ioannis Mpiliris, a United States citizen and domiciliary, who was widowed allegedly by reason of the defendants' negligence.

The prior case was litigated in a distant country, a most inconvenient forum for the plaintiff to contest the choice-of-law questions in the case that are so fundamentally important to her recovery.

It would have been extremely burdensome, and probably impossible for her to retain local counsel to represent her before the Greek court. The plaintiff elected not to participate in the Greek case and, instead, pursued the remedies afforded her under the laws of the United States. Her rights under American law as the widow of Ioannis Mpiliris should not be prejudiced by reason of the prior Greek litigation to which she was not a party and to which she was in no way connected. This country's interest in protecting the legislatively enacted remedies for wrongfully injured United States citizens is indeed substantial and, under the facts of this case, controlling.

As this court believes the facts of this case do not justify according greater preclusive effects to the Greek judgment than would be accorded a domestic or sister state judgment on the same facts, whether greater preclusive effects were, in fact, intended is moot and therefore will not be considered.

IV.

The defendants herein have also urged the court to decline to exercise any potential jurisdiction which may be found to exist because of the undeserving nature of the plaintiff's claim.

■ When a seaman to whom the American law is applicable suffers death by reason of his employer's negligence, two causes of action arise: one claim "is confined to his personal loss and suffering before he died, while the other is for the wrong to the beneficiaries and is confined to their pecuniary loss through his death". Van Beeck v. Sabine Towing Co., 300 U.S. 342, 347, 57 S.Ct. 452, 454, 81 L.Ed. 685 (1936). As to this latter cause of action, "(t)he measure of damages is compensation for the reasonable expectation of pecuniary benefits that would have resulted from the continued life of the deceased." Sabine Towing Co. v. Brennan, 85 F.2d 478, aff'd on these points, Van Beeck v. Sabine Towing Co., 300 U.S. 342, 57 S.Ct. 452, 81 L.Ed. 685 (1936).

The validity in this country of the plaintiff's marriage to Ioannis Mpiliris is undisputed. As the widow of the deceased, Ioannis Mpiliris, the plaintiff has a right to sue to recover her damages, if any, incurred by reason of the decedent's alleged wrongful death. And to the extent the plaintiff is unable to show any reasonable expectation of pecuniary benefit from the deceased had he lived, the amount of damages to which she is entitled to receive will be reduced, not her right to litigate the matter before this court.

## SUMMARY

This court has found (1) that the Jones Act is applicable to the facts of this case; (2) that the Jones Act is plaintiff's sole remedy and therefore suit under the general maritime law, the New York Wrongful Death and Survival Statutes and the doctrine of seaworthiness is improper; (3) the plaintiff is not bound by the Greek judgment; and (4) to the extent the plaintiff is unable to show injury, the amount of her recovery will be reduced, not her right to litigate the question.

Accordingly, it is hereby ordered, adjudged, and decreed that the defendants' motion to decline jurisdiction is denied, and defendants' alternative motion to strike the causes of action under American law on which plaintiff bases her case is granted to the extent the plaintiff's suit is based on the general maritime law, the New York Wrongful Death Statute, the New York Survival Statute, and the doctrine of seaworthiness, but defendants' alternative motion is in all other respects denied.

## SUPPLEMENTAL MEMORANDUM AND ORDER

In a Memorandum and Order dated May 15, 1969, the court held, in part, the Jones Act applicable to the facts herein and, accordingly, denied defendants' motion to decline jurisdiction in this case. Then, on May 29, 1969, upon the motion of defendants, the court stayed the May 15, 1969, Memorandum and Order, pending receipt and review of defendants' reply brief to plaintiff's brief of April 24, 1969. This Supplemental Memorandum and Order is in response to defendants' reply brief, filed herein on June 12, 1969, wherein the defendants request this court to withdraw the May 15, 1969 Memorandum and Order and hold the following: (1) plaintiff's marriage to Ioannis Mpiliris was void and plaintiff therefore has no status in law to sue under the Jones Act; and (2) the recent decision of the Court of Appeals for the Fifth Circuit in Hellenic Lines, Ltd. v. Rhoditis (5th Cir. 1969), 412 F.2d 919 was improperly decided and should not be considered controlling as to the applicability of the Jones Act to the present case. In the alternative, defendants ask that these questions be certified to the Court of Appeals for the Fifth Circuit pursuant to Section 1292(b).

The defendants asserted on several previous occasions that plaintiff's marriage to Ioannis Mpiliris before a Justice of the Peace in Houston, Texas, on or about March 13, 1966, was merely an arranged marriage whereby Ioannis Mpiliris could gain entry into this country on a preferred basis. Because of "the tainted and nondeserving nature of the plaintiff's claim," the defendants have consistently urged the court not to exercise jurisdiction herein.

As the court did not believe the validity of this marriage under the laws of the United States was disputed, it appeared appropriate once the court determined the laws of this country to be applicable, that plaintiff be allowed to sue herein as the surviving spouse of Ioannis. Mpiliris, deceased, and that to the extent she could not establish compensable injury, the amount of her recovery would be reduced, not her right to sue. The defendants now attack, it seems for the first time, the validity of this marriage, under the laws of this country, urging that it is a void marriage and that, accordingly, the

plaintiff does not qualify under Greek or American law as the widow of the deceased, Ioannis Mpiliris, and, thus, has no status to sue herein.

### I.

That the Texas marriage before the Justice of the Peace is not entitled to recognition under Greek law is undisputed as the marriage was not solemnized in the Greek Orthodox Church. Section 136 of the Greek Penal Code clearly codifies a national policy against such marriages. An official translation of Section 1367, filed herein by the defendants, states:

> "marriage contracted by and between those belonging to the Eastern Orthodox Church does not exist without solemnization executed by a clergyman of the same Church. The same instance is valid upon marriage of another dogma (heterodox). As provided for by said stipulation the marriage of a Christian Orthodox with Christian of another dogma must indispensably be administered by an Orthodox clergyman. In case this does not occur, no marriage exists and no consequence befalls. Regardless of whether such marriage was contracted in Greece or abroad. For, it is accepted that observance of this point of solemnization constitutes contistio sine qua non of the validity of such marriage."

The defendants now urge that because the marriage is void under Greek law, it is void everywhere, including Texas, the *lex loci celebrationis*. Defendants assert that the general conflicts-of-law rule in this area—that if a marriage is valid under the law of the State where celebrated it will be recognized as valid in every other jurisdiction — is inapplicable because when a marriage is strongly against the policy of the law of the domicile of either party, though the requirements of the law of the state of celebration have been complied with, such marriage will be invalid everywhere including the state of celebration.[1]

Juristic writers have argued that the *lex loci domicii* of each party at the time of the ceremony should always control the creation of the marital status and that if the domicile of either party refuses to recognize the extra-state marriage, it is void everywhere. *E. g.,* Beale, Conflict of Laws § 120.15 (1935); Beale, et al., Marriage and the Domicile, 44 Harv.L.Rev. 501 (1931); Goodrich, Conflict of Laws § 115, at 348–49 (3d ed. 1949). But this court does not believe that such a blind and dogmatic application of this broad statement of legal policy is warranted and, accordingly, feels compelled to question whether the policies underlying this general rule of law justify its application to the factual setting of this particular case.

The court has concluded that the dual domicile doctrine relied upon herein by defendants should be accorded, at most, only limited applicability. The doctrine, it seems, should be limited to those cases where the particular marriage not only runs counter to a strong policy of the domicile of one of the parties to the marriage, but also that this relationship of domicile-domiciliary is to survive the marital ceremony and be of continuing significance.

The court's conclusion finds support in the Restatement of Law Second Proposed Official Draft, Part III, Ch. 11, section 283, at p. 293 (April 22, 1969), wherein it is stated that "[t]o date * * * a marriage has only been invalidated [by reason of this dual domicile doctrine] when it violated a strong policy of a state where at least one of the spouses was domiciled at the time of the marriage *and where both made their home immediately thereafter."* (Emphasis added). The pro-

---

1. In support of this proposition defendants cite the Restatement, Conflicts of Laws, Section 132 (1965) and the Restatement of Law Second, Proposed Official Draft, Part III, Ch. 11, Section 283 (April 22, 1969).

tection of the justified expectations of the parties to a marriage should weigh heavily in deciding whether to apply the dual domicile doctrine and surely the parties to a marriage would normally anticipate that the law of the *lex loci celebrationis* would determine the validity of the marriage. So only when another state has the dominant interest in determining the validity of the marriage should its laws and policies control, and this court believes that when neither party to a marriage intends to make a state his domicile after the marriage, this state cannot possess the dominant interest in determining the validity of the marriage.

The policies underlying the dual domicile doctrine were thoughtfully probed and analyzed in Marriage in the Conflict of Laws, 9 Vand.L.Rev. 607, 611–14 (1956). As the court considers this article particularly well-reasoned and enlightened, pertinent parts thereof are quoted at length:

> The standard statement—a marriage which is valid under the *lex loci celebrationis* is valid, unless contrary to some strong public policy of the domicile or domiciles of the parties— is correct, at most, with respect to only a few cases, those in which the parties have, at the time of the ceremony, no intention to live as man and wife in any particular state.

> The situations in which states refuse to create the status on extra-state ceremonies involve fraud, duress, polygamy, miscegenation, insanity, incest, remarriage too soon after divorce, and nonage. It seems clear that the public policy which dictates the refusal to create the status is based on the interest of a state to protect itself against odious marriages, (polygamy, "progressive polygamy" through remarriage too soon after divorce, incest, miscegenation), from those which are feared to be the source of children who will be undesirable future citizens (incest, miscegenation, insanity), from those which are less likely than usual to be

peaceful, prosperous and lasting (fraud, duress, insanity, nonage).

> Therefore, the state whose laws should be looked to in order to discover a public policy strong enough to require a declaration that a particular marriage is void for a vice of substance is that in which the parties will live as man and wife—the intended family domicile. No domicile at the time of the ceremony has, as such, a sufficiently strong interest to justify the application of its laws to determine whether or not the parties are of such qualities, or in such relationship, that their marriage should be declared void, nor to determine that their marriage should be declared valid if the status is one which offends a strong public policy of the intended family domicile.

> There is support for this doctrine in the juristic writings. Speaking of the doctrine which requires that a marriage be held to be void if it is void under the marriage law of the domicile of either party, Cheshire says:

>> A rule of choice of law, such as that imposed by the dual domicil doctrine commands little respect if it is framed without regard to its impact upon the social life of the community which will be most intimately affected by its operation.

> Beale says:

>> If the purpose of the law in securing the domestic relations is successful, it will in fact result in a home and domicil in some particular state. The state chiefly interested in the maintenance of the domestic relations is this state of domicil in which the home is to be established and the relations exercised.

> It may be objected that there is no present contact between the parties to a purported marriage and the intended family domicile, and that some present contact is necessary as a

foundation for jurisdiction. One answer may be that, in cases of ordinary contracts, the conflict of laws rules of some states point to the law of the place of performance or to the "proper" law, and the only present contact between the transaction, or the parties, and that state may be in their minds. Another and better answer is that the asserted jurisdiction of the actual domiciles is founded on a legal concept and not necessarily on a close factual contact between persons and a state: one may have a domicile, though he has no present home, no present close contact with a state. His connection with his domicile, then, may be much more tenuous than that with the state in which he intends to make his home.

Those who insist that there must be a present connection between the parties and the state which is relied on for the creation of the status, may treat the intended family domicile rule as one which operates in the field of choice of law, a rule which is adopted by states because it produces better social results than the dual domicile rule. The indubitable urge to support marriages founded on extra-state ceremonies unless they violently conflict with some public policy, is not forwarded by that rule.

\* \* \* \* \* \*

There is some indication that courts are prepared to apply the intended family domicile rule. In Meisenhelder v. Chicago & N. W. Ry., 170 Minn. 317, 213 N.W. 32, 34 (1927), the court applied the law of Illinois, the domicile of the parties to which they intended to return and did return a few days after an extra-state ceremony, but seemed prepared to look to the law of Minnesota if it had been shown that they intended to live in that state. Apt v. Apt [1947 P. 127, 141], expressly held effective the proxy of an English domiciliary where the intended family domicile was the state in which the proxy

acted, but indicated that the result might have been different if that domicile had been England.

See also Cunningham v. Cunningham, 206 N.Y. 341, 99 N.E. 845 (1912).

It certainly appears that the dominant purpose of plaintiff's marriage to Ioannis Mpiliris was to enable Ioannis to gain entry into the United States on a preferred basis. The defendants have consistently urged this point and the plaintiffs have never denied it. Seemingly, at some time soon after his marriage to plaintiff, Ioannis Mpiliris intended to move to the United States, abandon his Greek domicile, and make his permanent home in this country. Had he done so, he would have become a United States domiciliary. See e. g., In re Finlayson's Estate, 206 N.C. 362, 173 S.E. 902, 903 (1934); Burr's Adm'r. v. Hatter, 240 Ky. 721, 43 S.W.2d 26, 28 (1931).

And, judging from the alacrity with which Ioannis seems to have entered into this marriage, the court believes that Ioannis would have become a United States domiciliary soon thereafter had he not met his death so untimely (less than three weeks after the marriage ceremony). Whether Ioannis intended to remain married to plaintiff and engage in a normal marital relationship with her is most doubtful. But for purposes of determining whether the dual domicile doctrine should be applied herein, it does not appear particularly relevant whether Ioannis harbored an intent to separate from or divorce the plaintiff after gaining entry into this country. Rather, the relevant inquiry seems to be what respective interests do Greece and the United States have in determining the marital status of these persons, regardless of whether or not their motives in entering into the marriage are considered.

Assuming *arguendo* that Ioannis intended to become a United States domiciliary soon after the marriage and would have if he had not met his untimely death, the interests of Greece

would seem to be very minor when compared to the interests of this country. Had Ioannis not died, the only effect the marriage would have had on Greece would be that it would have lost a domiciliary. It is difficult to perceive how the moral, religious or social fabric of · Greece would have been abused by this marriage as Greece was to have no contact with either of the parties. to the marriage.

The United States, on the other hand, in addition to being the *lex loci celebrationis,* but would also be the intended domicile of both parties to the marriage. As the intended domicile of plaintiff and Ioannis, the interest of this country in the marriage would be of fundamental domestic concern. In addition to being concerned with whether or not to accept or reject a new family unit, this country is vitally interested in assuring the regularity and integrity of the marital relationship between persons who are to make the United States their domicile, and in protecting and enforcing the rights and obligation incident to the marriages of such persons (*i. e.* the right to sue, as a surviving spouse in a death action): *See* Cheshire, Private International Law 291, 97 (4th ed. 1952); Beale, Conflict of Laws § 120.15 (1935). These interests are of paramount importance.

By reason of the above, this court is of the opinion, and so holds, that the intended domicile of the parties to a marriage has the most significant relationship to the marriage and, accordingly, possesses the dominant interest in determining its validity. In the instant case, the court strongly feels that the United States was the intended domicile of Ioannis Mpiliris and the plaintiff. Of course, such a determination would render the dual domicile doctrine (and the Greek statute declaring such marriages void) inapplicable. Evidence in the record of this case certainly seems to support such a finding. However, the court does not believe the issue has been established to the degree of certainty that would justify the making of such a finding at this time. Rather, the determination of this issue is deferred until the evidence herein is more fully developed upon the trial on the merits.

## II.

Although the court does not hold the marriage void *ab initio* by reason of the dual domicile doctrine, the question remains whether the marriage should be considered void for any other reasons. One of the defendants' arguments for treating the marriage as a nullity and refusing to allow plaintiff to sue herein as decedent's surviving spouse—that the marriage ceremony was performed solely to enable Ioannis to circumvent this country's immigration laws, not to consummate a normal marital relationship—amounts to, in essence, an attack upon the underlying marital agreement as being legally insufficient to support a valid marriage.

As previously stated, it seems that the plaintiff and Ioannis · Mpiliris did agree to go through the formal marriage ceremony before a Justice of the Peace solely to enable Ioannis to gain entry into this country. This court has good reason to suspect that the parties entered the marriage with the understanding that they were not to assume toward one another any of the duties, obligations, rights or privileges incident to a normal marital relationship. Assuming *arguendo* that all of this is true, the question arises whether such a mutual understanding or agreement may constitute a legal basis for the marital status asserted by the plaintiff before this court.

A marital relationship or marital status is based upon the agreement to marry or consent of the parties. In re Tersip's Estate, 86 Cal.App.2d 43, 194 P.2d 66 (1948); Graham v. Graham, 130 Colo. 225, 274 P.2d 605 (1954); Higgins v. Higgins, 246 S.W.2d 271 (Tex.Civ.App.—Austin (1952); Madison v. Robinson, 95 Fla. 321, 116 So.

31 (1928); Lefkoff v. Sicro, 189 Ga. 554, 6 S.E.2d 687 (1939); Elkhorn Coal Corp. v. Tackett, 243 Ky. 694, 49 S.W.2d 571 (1932). Accordingly, in order to create a valid marriage, it is said that the consent of the parties is absolutely essential.

Timmons v. Timmons, 222 S.W.2d 339 (Tex.Civ.App.—Galveston 1949); U. S. Fidelity & Guaranty Co. v. Dowdle, 269 S.W. 119 (Tex.Civ.App.1924); Topper v. Perry, 197 Mo. 531, 95 S.W. 203 (1906); Shenk v. Shenk, 100 Ohio App. 32, 135 N.E.2d 436 (1954).

As Bishop in his work on Marriage, Divorce and Separation, vol. 1 § 296, says: "The status of marriage is entered through the door of a contract not essentially differing from other contracts. It is that circumstance without which this status is never superinduced upon the parties."

And in § 298 he says: "The forms are not a substitute for it [mutual consent to enter into the status]. They are but modes of declaring and substantiating it—matters of publicity or evidence. If they are gone through without the added consent, the marriage is a nullity, both as to the parties and to third persons."

To constitute a valid marriage, the parties must * * * enter into a mutual agreement or consent to the marriage relation as contemplated by law * * * Spencer Domestic Relations, § 37.

According to these and other authors and decisions dealing with the subject, mutual consent and bona fide agreement of the parties, freely given, and with the intention of entering into a valid status of marriage, are fundamental and essential elements, and without them the marriage is invalid.

Crouch v. Wartenberg, 86 W.Va. 664, 104 S.E. 117 (1920).

It would seem that the mutual consent necessary to validate a marriage contract would include not only the willingness to participate in the marriage ceremony and intention that legal consequences attach, but would also include the intention to enter into the marital status and assume the obligations, duties, rights, and privileges which characterize this status. See, e. g. Kester v. Kester, 106 W.Va. 615, 146 S.E. 625, 627 (1929); Crouch v. Wartenberg, 86 W.Va. 664, 104 S.E. 117 (1920); Dorgeloh v. Murtha, 92 Misc. 279, 156 N.Y.S. 181 (1915); McClurg v. Terry, 21 N.J.Eq. 225 (1870); United States v. Rubenstein, 151 F.2d 915 (2d Cir. 1945), cert. den. 326 U.S. 766, 66 S.Ct. 168, 90 L.Ed. 462; United States v. Lutwak, 195 F.2d 748, 753–754 (7th Cir. 1952) aff'd, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953); United States v. Abdel-Khaleq, 354 F.2d 642 (7th Cir. 1965); Johl v. United States, 370 F.2d 174 (9th Cir. 1966).

A ceremonial marriage under proper certificate (as is, it seems, the present marriage between plaintiff and Ioannis Mpiliris), is presumed to be legal and valid. And all elements necessary to support its validity, including the requisite mutual consent of the parties to go through the ceremony and to enter into the marital status are presumed to have been present at the time of the marriage ceremony. See, e. g., United States v. Marlow, 235 F.2d 366 (5th Cir. 1956); Harsley v. United States, 88 U.S.App.D.C. 150, 187 F.2d 213 (1951); Freeman S. S. Co. v. Pillsbury, 172 F.2d 321 (9th Cir. 1940); Hatfield v. United States, 127 F.2d 575 (2d Cir. 1942); Gee Chee On v. Brownell, 253 F.2d 814 (5th Cir. 1958); Gaddy v. Louisville & N. R. Co., D.C., 249 F.Supp. 305, aff'd in part, rev. in part on other grounds, 386 F.2d 772 (6 Cir. 1965); Marris v. Sockey, 170 F.2d 599 (10th Cir.), cert. den., 336 U.S. 914, 69 S.Ct. 605, 93 L.Ed. 1078 (1949); Parson v. Parson, 387 S.W.2d 764 (Tex.Civ.App. —Fort Worth 1965, err. ref., n. r. e.); Black v. Shell Oil Co., 397 S.W.2d 877 (Tex.Civ.App.—Texarkana 1965, err. ref., n. r. e.). But, although this presumption is considered to be one of the strongest recognized by law [Tex.

Emp. Ins. Ass'n. v. Elder, 155 Tex. 27, 282 S.W.2d 371, 373 (1955); Carter v. Green, 64 S.W.2d 1069 (Tex.Civ.App. —Texarkana 1933, err. ref'd); Reed v. Reed, 202 Ga. 508, 43 S.E.2d 539 (1947); Welch v. All Persons, etc., 78 Mont. 370, 254 P. 179 (1927)], it is rebuttable [*e. g.*, United States v. Marlow, 235 F. 2d 366 (5th Cir. 1956); Harsley v. United States, 88 U.S.App.D.C. 150, 187 F.2d 213 (1951)]. So when, as in the present case, a fundamental element of consent seems to be lacking, it would seem, at first blush, that the presumption would be rebutted and, accordingly, the marriage would not be recognized as valid.

But the contention that the marital ceremony was insufficient for lacking elements of mutual consent necessary to give any contract validity has been generally rejected. (See Annot., 14 A.L.R. 2d 624 (1950) and cases cited therein.) The rationale often stated is that the marriage relationship has greater significance than ordinary private contracts— that the maintenance of the marital status is a matter of vital concern to the state and that individuals should not be allowed to tamper so lightly with a relationship of such fundamental importance. *E. g.*, Schibi v. Schibi, 136 Conn. 196, 69 A.2d 831 (1949); DeVries v. DeVries, 195 Ill.App. 4 (1915); Hanson v. Hanson, 287 Mass. 154, 191 N.E. 673, 93 A.L.R. 701 (1934); Delfino v. Delfino, 35 N.Y.S.2d 693 (Sup., 1942); Erickson v. Erickson, 48 N.Y.S.2d 588 (Sup., 1944); Campbell v. Moore, 189 S.C. 497, 1 S.E.2d 784 (1939); Phipps v. Phipps, 216 S.C. 248, 57 S.E.2d 417 (1950). *But see*, Kurys v. Kurys, 25 Conn.Sup. 495, 209 A.2d 526; Cirulli v. Licata, 10 N.J.Super. 449, 77 A.2d 288 (1950); Stone v. Stone, 159 Fla. 624, 32 So.2d 278 (1947).

When two people participate in a mock marriage ceremony as the result of jest, exuberance, hilarity or dare and harbor no intention to be bound thereby, most cases have allowed the marriage to be annulled, reasoning that the public interest would not be served by compelling these persons to accept the legal consequences of their imprudent conduct. *See*, Crouch v. Wartenberg, 86 W.Va. 664, 104 S.E. 117 (1920); Dorgeloh v. Murtha, 92 Misc. 279, 156 N.Y.S. 181 (1915); McClurg v. Terry, 21 N.J. Eq. 225 (1870); Meredith v. Shakespeare, 96 W.Va. 229, 122 S.E. 520 (1924); Davis v. Davis, 119 Conn. 194, 175 A. 574 (1934); *but see*, Hand v. Berry, 170 Ga. 743, 154 S.E. 239 (1930). But the present case certainly does not appear to fall within this exception. It seems obvious that this was not entered into as a result of jest, exuberance, hilarity or dare and it seems equally obvious that the plaintiff and decedent intended the ceremony to have legal effect. Although they entered the marriage, apparently, for a very limited and specific purpose, most courts have held such marriages valid—regardless of any agreement between the parties that the marriage ceremony is only obstensible and in form only. *E. g.*, Schibi v. Schibi, 136 Conn. 196, 69 A.2d 831 (1949); DeVries v. DeVries, 195 Ill. App. 4 (1915); Hanson v. Hanson, 287 Mass. 154, 191 N.E. 673, 93 A.L.R. 701 (1934); Delfino v. Delfino, 35 N.Y.S. 2d 693 (1942); Erickson v. Erickson, 48 N.Y.S.2d 588 (1944); Phipps v. Phipps, 216 S.C. 248, 57 S.E.2d 417 (1950); Campbell v. Moore, 189 S.C. 497, 1 S.E.2d 784 (1939); *contra*, Bove v. Pinciotti, 46 Pa.Dist. & Co. 159 (1942); Wagner v. Wagner, 59 Pa.Dist. & Co. 90 (1947).

█ This court considers the underlying rationale of the above cited authorities persuasive and concludes that by reason of the strong social interests in protecting the integrity of the marital status, when two persons, otherwise qualified voluntarily go through a *marriage* ceremony, albeit *for a limited* purpose, with the intention, mutual understanding and anticipation that the marriage is to be accorded legal significance, the marriage is binding and,

therefore, not subject to attack in a collateral proceeding.[2]

■ The court is not holding that the marriage between Ioannis Mpiliris and plaintiff is valid. This is a factual question to be determined upon the trial on the merits. Rather, this court holds as a matter of law that even if it is determined Ioannis Mpiliris and the plaintiff did enter the marriage solely to enable Ioannis to gain entry into this country, this factor alone will not render the marriage void.

### III.

In the Memorandum and Order dated May 15, 1969, the court stated that it considered the holding of the Court of Appeals for the Fifth Circuit in Hellenic Lines, Ltd. v. Rhoditis, 412 F.2d 919 (1969) dispositive of any questions regarding the applicability of the Jones Act to the facts of this case. The only difference in operative facts between *Rhoditis* and the instant case is that *Rhoditis* was not a death action, a difference this court does not consider material as the Jones Act provides for each form of action.

Rather than follow *Rhoditis*, the defendants urge the court to disregard that decision for the reason that it represents a clearly erroneous and unwarranted extension of American law. Defendants contend that the conclusion of the Court of Appeals for the Fifth Circuit in *Rhoditis* that the foreign corporate defendants therein were for all commercial purposes owned and operated by a United States domiciliary amounts to patent error and, accordingly, that court's reliance on this conclusion to justify applying the Jones Act should not be considered binding on this court.

This issue actually revolves around the status of only one person—Pericles Callimanopoulos, a Greek citizen who first came to this country in 1945, spending only part of his time in this country until 1956 or 1957 when he was admitted to the United States as a permanent resident alien. Callimanopoulos owns approximately 96% of the shares of a Greek corporation, the Hellenic Lines, Ltd., a defendant herein and in *Rhoditis*, of which the other corporate defendants herein and in *Rhoditis* are wholly owned subsidiaries. The Court of Appeals for the Fifth Circuit found the control and operation of these foreign corporate defendants from this country by their owner, Pericles Callimanopoulos, to be a sufficiently significant counterweight to the "law of the flag"—Greece—to justify applying the law of this country.

Callimanopoulos was issued a non-immigrant visa, classification G–1 for the period February 8, 1965, to February 8, 1967, and was issued a nonimmigrant visa, classification A–2 for the period from February 2, 1967, to the present. Callimanopoulos has been issued these classifications in recognition of his status in this country as a representative of the Greek government to the United Nations.

■■ This court cannot agree with defendants that Callimanopoulos is absolutely exempt from allegiance to this country and exempt from the presumption of domicile attaching to his continuous residence in the United States by reason of his status in this country as a representative to the United Nations. Representatives of foreign governments

---

2. Defendants have cited several cases in support of their position that the marriage can and should be considered void, at least for the purposes of this suit. But each of these cases involves prosecution for criminal conspiracy to obtain entry of an alien into this country. In these cases it was only necessary to find that the sole purpose of the marriage of the alien to a United States citizen was to avoid the immigration laws. Thus, any language to the effect that the marriages were void because of the lack of mutual intent to enter into a normal marital relationship was unnecessary to support any of these decisions. Accordingly, language in these cases declaring the marriages void should be afforded no greater weight than that afforded dictum.

to international organizations are only immune from suit and legal process relating to acts performed by them in their official capacity and falling within their functions as such representatives. 22 U.S.C. § 288d (1945). *See e. g.,* United States v. Egorov, 222 F.Supp. 106 (D.C. N.Y.1963); United States ex rel. Casanova v. Fitzpatrick, 214 F.Supp. 425 (D. C.N.Y.1963); United States v. Melekh, 193 F.Supp. 586 (D.C.Ill.1961). There are no other codified exemptions. Had Callimanopoulos' activities in the United States been restricted, at least substantially, to representing his government in his official capacity before the United Nations, defendants' arguments would, it seems, be entitled to more serious consideration. But his activities in this country have certainly not been so restricted. Not only is the principal office for Callimanopoulos' corporation, Hellenic Lines, Ltd., located in New York, but it appears that Callimanopoulos controls all of the corporate defendants from that and other offices in this country. Representatives of foreign countries, other than ambassadors, clearly were not intended to be exempted from the laws of this country as to such extra-official activities.

■■■ This court is also unwilling to construe the outcome of *Rhoditis* as being dependent upon its finding that Callimanopoulos is a United States domiciliary. The decision of the Court of Appeals for the Fifth Circuit appears to have been based upon a broader proposition: that as United States shipowners are subject to Jones Act liability to foreign seamen injured in American territorial waters while serving on foreign-registered vessels, it is only equitable that alien shipowners, residing in this country but registering their vessels

abroad, should also be so liable. Obviously the court felt a contrary holding would confer an unjustifiable competitive advantage upon such resident alien shipowners.

In Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) the Supreme Court listed seven factors it considered important in determining whether the Jones Act applies to a particular case. But in *Rhoditis* the Court of Appeals for the Fifth Circuit stated that the seven talismen of *Lauritzen* are neither exclusive nor immutable. This court agrees that *Lauritzen* cannot be considered to represent an attempt by the Supreme Court to exhaust the factors which may be relevant. *See also,* Pavlou v. Ocean Traders Marine Corp., 211 F. Supp. 320, 325 (S.D.N.Y.1962). Accordingly, it seems immaterial whether the above interest identified in *Rhoditis* falls neatly into one of *Lauritzen's* seven "immortal pillars." It suffices if Callimanopoulos' United States based business is a sufficiently strong connecting factor "between the shipping transaction regulated and the national interest served by the assertion of authority." Lauritzen v. Larsen, 345 U.S. 571, 582, 73 S.Ct. 921 (1952). As the Court of Appeals for the Fifth Circuit has answered this question affirmatively on operative facts identical to those of the present case, this court considers *Rhoditis* controlling.

## IV.

Predicated upon an adverse ruling by this court on their other motions, defendants also move the court to certify its Memorandum and Order of May 15, 1969, for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).[3] Defendants assert that there exist such controlling

3. Section 1292(b), the statutory authority relied upon by defendants, provides inter alia: "When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal

from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order * * *."

questions of law in the May 15, 1969 Memorandum and Order as to satisfy the requisites for a section 1292(b) interlocutory appeal and that its ruling on these highly important issues can be reviewed by the Court of Appeals for the Fifth Circuit at the same time that it considers the Petition for Rehearing En Banc which defendants have informed the court is to be filed in the controlling case of Hellenic Lines, Ltd. v. Rhoditis.

Controlling questions of law as to which there is substantial ground for difference of opinion doubtlessly are present in this case. This is particularly true with respect to the applicability of the Jones Act to these facts, as evidenced by the direct conflict on this point between the Second Circuit [Tsakonites v. Transpacific Carriers Corp., 368 F.2d 426 (1966)] and the Fifth Circuit [Hellenic Lines, Ltd. v. Rhoditis, 412 F.2d 919 (1969)]. However, as the Court of Appeals for the Fifth Circuit recently denied the petition for rehearing and the petition for rehearing en banc in *Rhoditis* (July 3, 1969), that court is certainly not likely to now allow an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) on questions of law in this case concerning Jones Act applicability that were decided in *Rhoditis*. The facts also raise two other controlling questions: (1) whether the Greek judgment should be accorded internationally preclusive effect herein and (2) whether plaintiff has status to litigate this case as the surviving spouse of the decedent Ioannis Mpiliris. The *Rhoditis* decision clearly requires an affirmative answer to the issue concerning Jones Act applicability, and, of course, the court believes it correctly decided the other two issues mentioned in this paragraph. But as is often the case with the law, substantial grounds for difference of opinion do exist as to each of these questions.

However, the section 1292(b) interlocutory appeal was not intended to open the flood gates to a vast number of appeals from interlocutory orders merely to provide review of difficult rulings in hard cases. The section 1292(b) appeal is proper when the appellate decision may avoid protracted and expensive litigation. United States Rubber Co. v. Wright, 359 F.2d 784 (9th Cir. 1966); Medomsley Steam Shipping Co. v. Elizabeth River Terminals, Inc., 317 F.2d 741 (4th Cir. 1963); Milbert v. Bison Lab., Inc., 260 F.2d 431 (3d Cir. 1958); Thompson v. United States, 214 F.Supp. 97 (D.C.Ohio 1962). But judging from the nature of the case and all other indicia, the court does not believe the litigation of this case will be either protracted or exceedingly expensive so as to fall within the above exception or the spirit of Section 1292 (b). Thus, defendants' Section 1292(b) motion should be denied.

Accordingly, it is hereby ordered, adjudged and decreed that the Order of May 29, 1969, staying issuance of the May 15, 1969 Memorandum and Order is set aside; that the May 15, 1969 Memorandum and Order is supplemented by this Supplemental Memorandum and Order; that defendants' motion for reconsideration of the May 15, 1969, Memorandum and Order is denied; and that defendants' motion to certify such Memorandum and Order pursuant to 28 U.S.C. Section 1292(b) is denied.

Clerk will enter this Supplemental Memorandum and Order and provide counsel for all parties with true copies hereof.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The plaintiff, Myrtis Ioannis Mpiliris, brought this suit as the widow of Ioannis Biliris (also spelled Mpiliris), deceased, against the defendants, Hellenic Lines, Limited, the operating company, and Transpacific Carriers Corporation and Universal Cargo Carriers, Inc., the owners of the S/S HELLENIC DESTINY. Plaintiff, a United States citizen, seeks to recover damages for the death of her husband, Ioannis Biliris, a Greek citizen. Ioannis Biliris incurred fatal injuries while he was employed as a seaman on the S/S HELLENIC DESTINY, one of

the defendants' vessels, while said vessel was moored at a dock in Brooklyn, New York, U.S.A. on March 31, 1966. The case having been tried before the court, and the court having fully considered the testimony of the witnesses, the exhibits introduced into evidence, and the arguments and briefs of counsel, the court now makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1.

In this cause the plaintiff, Myrtis Marie James Mpiliris, sues as the widow of Ioannis Biliris (also spelled Mpiliris), a deceased Greek seaman who was employed as an Able Seaman aboard the S/S HELLENIC DESTINY, a Greek flag vessel, between September 4, 1965, and March 31, 1966, when he suffered fatal injuries aboard the vessel while it was moored at Brooklyn, New York.

2.

The plaintiff brings suit as administratrix, but not as personal representative, of the estate of Ioannis Biliris, deceased, against Hellenic Lines, Limited, the vessel operator, and Transpacific Carriers Corp. and Universal Cargo Carriers, Inc., owners of the S/S HELLENIC DESTINY, alleging alternatively the applicability of the Jones Act (46 U.S. C.A., § 688 et seq.), the New York Wrongful Death and Survival Statutes and the general maritime law of the United States.

3.

Ioannis Biliris, deceased, was a Greek citizen, 27 years of age when his fatal accident occurred. He was a domiciliary of Greece employed aboard the S/S HELLENIC DESTINY under a Greek Collective Bargaining Agreement and pursuant to a Greek employment contract which provided that all disputes and claims arising out of the employment contract would be resolved solely pursuant to Greek law. The deceased had lived in Greece all of his life and had been educated through six years of primary school and three of the six years of high school in Greece. He served in the Greek Navy from July 7, 1960 to September 2, 1962 when he was discharged as a reserve seaman with the specialty of signalman. Thereafter, he entered the Greek merchant marine where he was regularly employed, serving as an Able Seaman on the S/S HELLENIC DESTINY at the time of his death, March 31, 1966.

4.

The S/S HELLENIC DESTINY at all times material hereto was owned by Transpacific Carrier Corp. and Universal Cargo Carriers, Inc., Panamanian corporations, and was operated under the Greek flag by Hellenic Lines, Limited, a corporation organized under the laws of Greece.

5.

All of the stock of Transpacific Carrier Corp. and Universal Cargo Carriers, Inc. is owned by Hellenic Lines, Limited.

6.

Pericles G. Callimanopoulos owns approximately 95 percent of the stock of Hellenic Lines, Limited.

7.

Pericles G. Callimanopoulos has resided in the United States as a legally admitted resident alien in excess of twenty years.

8.

The principal office of Hellenic Lines, Limited in the United States is located at 39 Broadway, New York, New York.

9.

For a substantial number of years prior to 1966, Hellenic Lines, Limited owned and/or operated at least sixteeen seagoing vessels that made continuous, regularly scheduled runs pursuant to such liner services including those between various Gulf ports of the United States and Europe and the Middle East.

The officers and crew of the S/S HELLENIC DESTINY and all other Hellenic Lines, Limited vessels are regularly sign-

ed on in Greece pursuant to the Greek Collective Bargaining Agreement between shipowners and Greek maritime unions with each seaman.

### 10.

The plaintiff, Myrtis Marie James Mpiliris, is a resident of Houston, Texas, and an American citizen who was 33 years of age on March 31, 1966, when the deceased sustained fatal injuries. She was graduated from high school in 1952, and thereafter she worked in various capacities for an ice cream company, St. Joseph's Hospital and Doctor's Hospital in Houston, taking occasional courses on a part-time basis at the University of Houston.

### 11.

Before meeting the deceased, the plaintiff had met a Greek seaman, Pantiles Zannikos, with whom she lived while his vessel was in Houston for a period of approximately two weeks in 1965. Zannikos expressed a desire to marry the plaintiff and had met her family, but after he sailed he informed her by letter that she would have to raise a $3,000 dowry before the marriage could take place. She had not been able to do so, although she continued to profess her love for Pantiles Zannikos who had not returned to Houston thereafter.

### 12.

Ioannis Biliris, deceased, had an older brother, Demitrius Biliris, who had come to the United States as a Greek seaman on a Greek flag vessel in 1961. While his vessel was moored in Houston, Demitrius met Koula Dadinis, a Greek born, naturalized American citizen, whose husband had died within the past year, leaving her as a widow with four children. She had inherited her deceased husband's businesses, consisting of the Harbor Light Bar, an adjoining clothing store and another bar, all located on McCarty Drive near the turning basin of the Houston Ship Channel.

### 13.

Demitrius Biliris and Koula Dadinis decided to marry and were married before a Justice of the Peace in Houston while Demitrius' ship was in port in July, 1961, following which it was agreed that Demitrius would sail with his ship and thereafter to return as a non-quota immigrant. After approval of the application made to the Immigration authorities by Koula, Demitrius ulitmately entered the United States on such a preferred basis in July, 1962. Koula and Demitrius then lived together as husband and wife, entering into a marriage ceremony in the Greek Orthodox Church in Houston some months later. They remained married until May, 1968, when Demitrius obtained a civil divorce in Reno, Nevada. During the marriage Demitrius performed whatever work he did in and around the clothing store and the Harbor Light Bar, never obtaining or retaining any outside employment.

### 14.

When Ioannis Biliris, the deceased and younger brother of Demitrius, completed two years of service in the Greek Navy in 1962, he entered the Greek merchant marine and periodically sailed on Greek flag vessels whose itinerary included ports in the United States. Ioannis and Demitrius corresponded, and Demitrius interested Ioannis in coming to live in this country. Koula and Demitrius discussed ways to gain entry for Ioannis. Inasmuch as he was not a high school graduate, he was not eligible for a student visa. It was finally decided that Ioannis should marry an American girl and thereby enter the United States, as did Demitrius, as the husband of an American citizen.

### 15.

Ioannis made three visits to Houston as a Greek seaman in 1965 and 1966. On the first occasion in 1965, efforts were made to find some girl to marry Ioannis while he was in Houston. Inasmuch as Ioannis spoke very little, if any, English, Demitrius did the talking. His efforts to arrange a marriage for Ioannis were unsuccessful, and Ioannis rejoined his ship. The second visit of Ioannis was in late 1965, and again similar efforts were

made; however, nothing definite materialized. Ioannis thereafter wrote a letter to Demitrius on February 4, 1966, about his impending arrival in the United States on a Greek vessel in March in which he indicated his interest in American girls stating that "you can forget about the girl in New Orleans" who had never written to him. He further wrote in the letter that he would call Demitrius from New York when he arrived, and "as for the girl you have in mind, keep her posted * * *"

### 16.

During 1965 and until Ioannis arrived in Houston in March, 1966, Demitrius. with the assistance of his wife, Koula, had made numerous efforts to locate some American girl to marry Ioannis. Demitrius, also known as "Jimmy," had approached various women in Koula's Harbor Light Bar, including two barmaids, Arlene Rowan, age 28, who was already married, and another barmaid named Helen, about 45 or 50 years of age. He also propositioned without success, a young Go-Go dancer named Ann.

Mrs. Pansy McGee, who had previously worked as a cashier for Koula in the Harbor Light Bar, and her stepdaughter, Diane Kramer, who was then 12 years old, were present when "Jimmy" tried to persuade certain other girls to marry his younger brother. These included Martha Claimons, Carolyn "Lulie" McGee and Jean Pillow.

### 17.

Two of the girls who might have been interested in the marriage refused when it was represented to them that the arrangement was to only last long enough for Ioannis to enter the country and obtain his citizenship papers. One was Jean Pillow, age 25, who was a divorcee with four children. Another girl, Martha Claimons, who lived in a small town some distance outside of Houston, came to Houston to talk to "Jimmy". She was very anxious to get married, but she lost interest when she was told by him that it was to be a temporary arrangement. It was because of Martha's refusal that "Jimmy" approached the plaintiff.

### 18.

"Jimmy" promised gifts to the girls in some instances, and he actually made gifts at other times. Carolyn "Lulie" McGee, age 16, was given a necklace, a coat and a jacket from merchandise in the clothing store; he told her that "she would never want for anything" if she married Ioannis. Jean Pillow did not receive any gifts, but "Jimmy" gave her children cases of soft drinks. However, Jean was promised a new car, a brick house and an interest in a business by "Jimmy", if she went through with the marriage. Diane Kramer was present when Carolyn "Lulie" McGee and Jean Pillow were propositioned, and she testified that "Jimmy" was trying to buy a wife to marry his brother so that he could get him into the country.

### 19.

The plaintiff first met Demitrius and Koula Biliris when she visited the clothing store with Pantiles Zannikos. After Pantiles Zannikos' vessel sailed from Houston, she came to Koula and Demitrius for assistance in translating the letters written in Greek which she received from this Greek seaman whom she said that she loved. She thereafter saw Demitrius as a patient in Doctor's Hospital where she worked at the time. Shortly before the arrival of Ioannis in March, 1966, the plaintiff was asked by Demitrius and Koula if she knew any nice girls who would marry Ioannis. The plaintiff was to ask her sister, Blanche, but her sister indicated that she did not want to meet any foreigners.

### 20.

Ioannis arrived in Houston on board the S/S HELLENIC DESTINY on March 16, 1966 at 2300 hours. The plaintiff was contacted by Koula the next day, and she came to the clothing store about 9:30 that evening. Neither Ioannis nor Myrtis had ever known, corresponded with or seen the other before that time. Although the plaintiff could not speak

Greek, and Ioannis could not speak much, if any, English, Koula introduced them and acted as interpreter. Later on that evening, the plaintiff agreed to marry Ioannis. The fact that the marriage would enable Ioannis to gain admittance into this country as a non-quota immigrant was a principal reason for the marital agreement. But the court does not believe that the plaintiff and Ioannis intended that the proposed marriage would be of only a temporary nature. The evidence very clearly shows that the plaintiff intended to enter into a permanent marriage.

### 21.

The following day, March 18th, the plaintiff and Ioannis, accompanied by Koula and Demitrius, purchased rings, obtained blood tests at St. Joseph's Hospital in Houston and applied for a marriage license. The plaintiff did not notify her parents that she was getting married, as she was afraid they might not approve after her experience with Pantiles Zannikos. She called her two sisters to invite them to the wedding, but they could not come. The wedding was performed by a Justice of the Peace at about noon, following which plaintiff returned to her work and Ioannis returned to work on the vessel.

### 22.

The plaintiff, Ioannis, Demitrius and Koula met later in the evening and had dinner at a Chinese restaurant. After dinner they then went to the house of Demitrius and Koula. The plaintiff and Ioannis spent the night in the garage apartment behind Demitrius' and Koula's house. At approximately 9:37 P.M. the next day, Ioannis sailed from Houston on the S/S HELLENIC DESTINY.

### 23.

The S/S HELLENIC DESTINY sailed from Houston to Brooklyn, New York with intermediate calls at Tampa, Florida and Charleston, North Carolina. From each of these ports Ioannis sent greeting cards to the plaintiff with brief written messages. At each port Ioannis called Demitrius or Koula at Houston, and on one occasion he spoke briefly with the plaintiff who was present at Koula's home when the call was received. On the day before his fatal accident, Ioannis called Demitrius from New York and wanted to leave the vessel, since he had been told he could do so as the husband of an American citizen. On the advice of Demitrius, Ioannis stayed aboard the S/S HELLENIC DESTINY so that there would be no difficulty with the Immigration authorities when the plaintiff applied for his nonquota visa to enter the United States.

### 24.

On March 31, 1966, the S/S HELLENIC DESTINY was moored at the Port of New York, loading general cargo. At approximately 4:45 P.M., loading was terminated at the No. 2 forward hatch, and Chief Officer Kapsis ordered Boatswain Vardakis to secure the boom. The Boatswain began to do so with the assistance of two sailors, Galanos and Angelidis, both of whom went up the mast to pull the boom into its receptacle. During this operation, the boom either struck its receptacle or surged against it in such a way as to cause a crack at the base of the receptacle. This crack was reported to the Boatswain by the two sailors who had climbed the mast, but the Boatswain passed the matter off, saying that it was nothing but an old crack. Despite the repeated protestations of Angelidis that the crack was new and had resulted in a distortion of the housing, the Boatswain ignored the warning, did not examine the receptacle and did not report the incident to his superiors. The Boatswain thereafter attempted to shift the blame to others and to the existence of the old crack. The boom was never actually secured, as it was to be needed again later that day.

### 25.

On March 31, 1966, at approximately 8:00 P.M., heavy lifts were being loaded aboard the S/S HELLENIC DESTINY. A tractor of approximately 35 tons was being loaded at 8:25 P.M., and this heavy

load caused vibrations of the boom and the mast with which Boatswain Vardakis and Sailors Angelidis and Galanos had previously been working that afternoon. Due to these vibrations, the receptacle, which held the boom and which had been damaged and distorted that afternoon, was detached and fell. While Ioannis Biliris was handling ropes nearby, the receptacle fell on him, rendering him immediately unconscious.

#### 26.

Ioannis Biliris was immediately taken to Maimonides Hospital in Brooklyn, New York, where, despite preventive measures, he expired at approximately 10:00 P.M., having never regained consciousness.

#### 27.

■ The Greek Harbormaster promptly conducted an investigation of the accident and rendered a detailed report, complete with log entries, statements of the crew and other relevant data. He also rendered his findings in which he attributed the accident to the negligence of Boatswain Vardakis. As a result of such negligence, the Greek District Attorney preferred charges against the Boatswain for manslaughter by inadvertence, and the Greek authorities removed the Boatswain's sailing documents for a period of 20 months. Clearly, the death of Ioannis Biliris was proximately caused by the negligence of defendants, acting by and through members of the crew of the S/S HELLENIC DESTINY.[1] Ioannis Biliris was not contributorily negligent.

#### 28.

News of Ioannis' accident aboard the vessel came to Demitrius and Koula by telephone from another seaman. The first information was that Ioannis had been seriously injured during loading operations. The plaintiff was notified, but before plans to go to New York were

agreed upon, word came that Ioannis was dead. Demitrius and the plaintiff flew to New York, and upon arrival went to the house of a relative, who took them to the Brooklyn docks to board the S/S HELLENIC DESTINY where they interrogated certain members of the crew. That evening the relative called a nearby hotel and thereafter drove Demitrius and the plaintiff to the hotel where they registered and spent the night together in room 426. On the following morning they went to the hospital where arrangements were made for shipment of the body in a casket to Houston for which the shipowners paid $462.80. The plaintiff and Demitrius then returned to Houston by plane. Local funeral arrangements were made through the Hyde Park Funeral Home in Houston, and funeral expenses of $1,330.59 were paid by the plaintiff. A burial marker costing $144.85 was thereafter erected. This expense was paid by the plaintiff.

#### 29.

After returning to Houston from New York, Demitrius telephoned his mother, Maria Biliris, in Greece and told her about Ioannis' death aboard the vessel. She had been almost wholly dependent upon the deceased and received regular sums approximating $60 per month from him. The mother and her daughter, Evdoxia Smalios, then engaged an attorney in Piraeus, Greece who served an Extra-Judicial Invitation (notice of claim) on April 9, 1966 on Hellenic Lines, Limited to recover damages for the death of Ioannis Biliris pursuant to the Greek law.

#### 30.

The mother, upon the advice of her Greek attorney, negotiated with Hellenic Lines, Limited and the shipowners and settled her claim in Greece pursuant to Greek law. A judgment pursuant to settlement was entered in the Court of First Instance in Piraeus, Greece on January

[1]. Although it is not necessary to the establishment of defendants' liability in this case, the evidence also clearly shows that the death of Ioannis Biliris was proximately caused by the unseaworthiness of the S/S HELLENIC DESTINY.

21, 1969, awarding the mother 250,000 drachmas, or approximately $8,300 in American money, in return for which she released any and all claims that she possessed or might possess under the Greek or American or any other law.

### 31.

■ The court finds from the evidence introduced that the marriage between Ioannis Biliris and the plaintiff was a valid marriage, and presumably was to be a lasting one, despite the fact that a principal reason for Ioannis' marrying plaintiff was to obtain entry into the United States as a non-quota immigrant. The evidence shows that the plaintiff took her marriage seriously and was very happy during the thirteen days they were married before Ioannis' death. The evidence shows that she embraced her new relatives, and during the thirteen days before her husband was killed, and for a substantial period thereafter, she spent a considerable amount of time with them. Koula was teaching her how to cook Greek foods and advised her about Greek customs. The evidence quite clearly shows that the plaintiff was grief-stricken by the death of her husband and has really never ceased mourning his passing. Members of the plaintiff's family testified that the plaintiff took the marriage very seriously, and continues to mourn Ioannis' death.

The court believes that the testimony of defendant's witnesses to the contrary is entitled to very little weight, particularly that of Koula Dadinis and Arleen Rowan. The court was not persuaded by the testimony of Pansy McGee, Deane Kramer, Jean Pillow Jackson and Leslie Coward, that the marriage was to be temporary and only a sham. Although Demitrius denied having done so, the court believes that he did propose to each of these persons that they marry Ioannis, and stay married to him only so long as necessary for Ioannis to become a citizen of this country. But this does not show that Ioannis was seeking a temporary marriage or that Ioannis and the plaintiff agreed to enter only a temporary marriage. It only shows that Demitrius was looking for a temporary marriage for Ioannis.

### 32.

The evidence shows that the plaintiff and Ioannis intended to make their home in the United States and would have done so if Ioannis had not been killed in March of 1966.

### 33.

Koula Dadinis and Demitrius Mpiliris intended to help Ioannis Biliris gain admittance into the United States and have him work with them in the expansion of their business. But due to marital problems between Demitrius and Koula, which culminated in their being divorced in May of 1968, the proposed venture in that business would not have been realized, and Ioannis would have had to have worked elsewhere.

### 34.

In all reasonable probability, Ioannis would have continued to follow his life of the sea by taking employment in a capacity similar to his past employment as a Greek seaman. The record does not support a finding that Ioannis would have pursued any other type of employment.

### 35.

What employment Ioannis Biliris would have pursued, had he lived, and what he would have earned in such employment cannot of course be determined with anything approaching certainty. Computations of lost future wages obviously involve a multitude of unknown factors and are necessarily based upon only what is most reasonably probable in light of the evidence of the particular case.

### 36.

The defendant urges that the only proper measure of lost future earnings, assuming same are a proper element of damages in this case, would be the

amount Ioannis might reasonably have been expected to earn if he had continued to be employed as a Greek seaman, or approximately $1,785.00 per year of his then remaining work life expectancy of 36 years. The plaintiff, on the other hand, urges that it would be manifestly unfair to limit recovery to this amount. Plaintiff submits that it is more reasonable to assume that Ioannis would have either (1) obtained employment aboard an American merchant vessel, and earned wages ranging from $9,000.00 to $12,-000.00 per year, (2) obtained employment as a seaman on tugboats in inland American waters, and earned wages of approximately $530.00 per month, or (3) obtained employment as a crew member on an offshore drilling rig, and earned approximately $738.00 per month. Plaintiff also urges, that, if the court should find that Ioannis Biliris would have continued to be employed as a Greek seaman, Ioannis would have progressed to Second Mate, Chief Mate and finally to Master.

### 37.

 The evidence in this case indicates that Ioannis Biliris had progressed only through 3 years of the 6-year high school curriculum in Greece. He was 27 years old at the time of his death and there is no indication in the record that he intended to further pursue formal education or training necessary to qualify him for employment as a licensed seaman or officer. Thus, the computation of his future loss of wages can only be based upon the premise that Ioannis would have continued to be employed as an unlicensed seaman, or in a similar capacity, throughout his work life.

### 38.

It is most reasonably probable that Ioannis Biliris would have continued to sail as a Greek seaman for several years after his marriage to the plaintiff, even though he probably would have made his home in the United States soon after the marriage. But, eventually, he probably would have obtained employment as an American merchant seaman or American employment in some similar capacity. The court believes that he would have done so within approximately 6 years after the marriage.

Undoubtedly Ioannis would have wanted to qualify as soon as possible for the higher salaries earned by Americans employed in similar capacities. But several hurdles would have stood in his way. The evidence indicates that the majority of American flag vessels sailing from Texas ports are subsidized by the United States government. Statutes provide that in order to sail on these subsidized vessels merchant mariners, licensed or unlicensed, must be native-born or completely naturalized citizens of the United States. Also, although a Greek seaman with an able seaman certificate issued in Greece can ship out aboard American merchant vessels as an able seaman, provided he has entered the country legally, certain Coast Guard regulations also require the following: he must pass a prescribed physical examination; he must have met the sea service or training requirements of the United States Coast Guard; he must have satisfactorily passed an examination demonstrating ability as an able seaman and lifeboatman, and he must be able to understand and speak English. Additionally, to be eligible to make application for a United States Merchant Mariner's Document, an alien must present acceptable documentary evidence from the immigration authorities that he is lawfully admitted into the United States. This evidence may be in the form of an alien registration receipt card issued by the immigration authorities or a declaration of intention to become a citizen of the United States issued by the Naturalization Court.

Evidence in this case indicates that the statutes, regulations and other requirements mentioned in the preceding paragraph are not rigidly enforced. Mr. Kirby McDowell, a National Maritime Union Port Agent, testified that a seaman does not have to be a full member to obtain the union's services and he does not have to be a United States citizen to be shipped through the Union's hiring hall. He stated that Latin Americans

and Greeks represent the largest group of foreign seamen that ship through his union's hiring hall, although possibly every nationality is represented. He did state that a Greek seaman would have to obtain clearance to be in the country before his union would ship him through its hiring hall, and that the Greek seaman would also have to qualify under the Coast Guard regulations. But he testified that the seaman can pass the English language requirement if they can understand and speak some English, and that there are several hundred employed who speak and understand very little English. He also stated that although statutes require that on government subsidized ships the crew must be 100% United States citizens, in practice the government does not enforce this requirement. In fact, he stated that government subsidized vessels have 50% foreign seamen. Mr. McDowell further stated that there has been a shortage of seamen in the American Merchant Marine from at least as early as 1967.

Although Ioannis knew little, if any, English at the time of his marriage to the plaintiff, the court believes that his knowledge of English would have improved sufficiently to enable him to pass the English language requirement. Ioannis Biliris was shown to have been an industrious person, and although his education was limited, he was not shown to be other than a reasonably intelligent individual. Married to an English-speaking American and living in the United States for probably at least 2 months each year (during his time off), Ioannis surely would have learned at least enough English to obtain employment aboard American vessels. It is also probable that Ioannis eventually would have become naturalized and therefore could have shipped aboard subsidized vessels, even if the statutes were strictly enforced. But even if he would not have become naturalized, he probably would have obtained employment aboard an American vessel, whether subsidized or not, within this period.

39.

At the time of his death, Ioannis Biliris was 27 years old. According to the Table of Working Life; Males, 1960, Ioannis Biliris had 36 years remaining during which he would have participated in the labor force.

40.

On the date of his death, March 31, 1966, Greek abled bodied seamen were earning a base wage of $114.40, including a bonus of one pound ($2.80) per month. Ioannis Biliris was earning an average of $34.68 per month in overtime earnings. Thus, he earned an average total monthly wage of $148.48 and would have continued to do so through May 11, 1967. If he had worked each month during this period, his earnings would have been $1,983.92 [$148.48 x 13 months = $1930.-24; plus average daily earnings of $4.88 (148.48 x 12 months ÷ 365 days) x 11 days = $53.68]. But because seamen work on the average only 10 months each year, his estimated earnings should be reduced by $296.96, netting lost earnings during this period in the amount of $1,-686.96.

41.

On May 11, 1967, the base wages of able seamen were increased, and Ioannis Biliris would have then earned a total of $145.04 base wage, including $2.80 per month bonus. His average overtime earnings remained the same. Ioannis Biliris would have continued to earn these amounts, totaling $179.72 per month, until October 6, 1967. Thus, Ioannis Biliris' earnings for this period would have been $874.68 [average daily earnings of $5.91 ($179.72 x 12 months ÷ 365) x 148 days (May 11, 1967 to October 6, 1967)].

42.

On October 6, 1967, the British Pound was devalued, and a pound was worth $2.40 instead of $2.80. The crewmen who thus were earning $121.92 following devaluation, were paid a 16 percent increase to compensate for such devalua-

tion and thereby earned a total of $141.-42 per month plus a bonus of 1 pound, or $2.40. With overtime, Biliris' monthly wage would have been $178.50. Thus, Ioannis Biliris' earnings from October 6, 1967 to the date of judgment in this cause would have been $6,215.75 (average monthly wage of $178.50 x 34 months (October 6, 1967 to August 31, 1970 plus average daily wages of $5.87 (178.50 x 12 months ÷ 365 days) x 25 days (August 6 to August 31, date of judgment)], if he had worked each of the months in this period. Adjusted for an average of 2 months not worked each year during the period from May 11, 1967 to date of judgment, or 6 months, Ioannis Biliris' lost earnings during this period would amount to $5,137.43 ($6,215.75 less 6 months wages of $179.72 per month, or $1,288.32).

### 43.

Thus, for the period beginning on April 1, 1966, the day after Ioannis Biliris died, and ending on the date of this judgment, Ioannis Biliris' total gross income would have been $7,699.07.

### 44.

From August 31, 1970 through March 31, 1972, Ioannis Biliris' total gross income would have been $2,856.00 (average monthly wage of $178.50 x 16 months he would have worked during the 19 month period).

### 45.

By April 1, 1972, Ioannis Biliris would have, in all reasonable probability, obtained employment as an American seaman and, although he undoubtedly would have changed jobs several times thereafter, he would have in all reasonable probability continued to be employed in some similar capacity throughout the remainder of his work life.

### 46.

The evidence in this case indicates, and the court so finds, that Ioannis Biliris might reasonably have been expected to earn, on the average, $9,000 per year from approximately April 1, 1972 through March 2002, while employed as an American seaman, or in similar capacities.

### 47.

Ioannis Biliris had been a substantial contributor to his mother's support and had contributed approximately $60.00 per month to her for such support. These contributions were made during the 10 months in which he and other Greek seamen generally worked. It is stipulated that Ioannis Biliris' mother was 60 years old at the time of his death and had a life expectancy of 20 years at that time. Thus, Ioannis Biliris' contributions to his mother would have continued through the year 1986.

### 48.

Of the amount remaining after Biliris had made such contributions toward his mother's support, the court finds he would have expended one-half for his own benefit. The plaintiff would have been deprived of the other half as a result of his death.

### 49.

Thus, from April 1, 1966 to date of this judgment, the plaintiff has been deprived of $2,524.54 [total earnings of Ioannis Biliris during this period of $7,699.07, less $2,650.00 ($60.00 per month for his mother's support x 10 months each year x 4 years (2,400); plus $60.00 x 10 months x 5⁄12 of year for period from March 31, 1970 through August 31, 1970) divided by 2].

### 50.

From date of this judgment through approximately March 31, 1972 the plaintiff will be deprived of $49.38 each month [yearly earnings in the amount of $1,785.00 less $600.00 ($60.00 per month for his mother's support x 10 months each year), divided by 12, divided by 2], or a total of $1,530.78 for the 31 months.

### 51.

From approximately April 1, 1972 through approximately March 31, 1986 plaintiff will be deprived of $4,200 each

year (yearly earnings in the amount of $9,000.00 less $600.00 for yearly support, divided by 2).

52.

From approximately April 1, 1986 through approximately March 31, 2002, plaintiff will be deprived of $4,500 each year (yearly average earnings of $9,000 divided by 2).

53.

■ When each of the amounts in Findings of Fact 50, 51 and 52 are discounted to present value at the rate of 4½ per cent, compounded interest per annum, they total $65,729.16. This amount, plus the lost contributions to plaintiff from the date of Ioannis Biliris' death to date of judgment in the amount of $2,524.54, if paid now, would reasonably compensate the plaintiff for the contributions Ioannis Biliris might reasonably have been expected to make to plaintiff out of his earnings from April 1, 1966 through March 31, 2002 (his remaining work-life expectancy if he had not died untimely). Thus, the reasonable present value of plaintiff's lost contribution from Ioannis Biliris total $68,253.70.

54.

■ Ioannis Biliris was immediately rendered unconscious as a consequence of the injuries he sustained on the S/S HELLENIC DESTINY which resulted in his death. There is no evidence of any conscious pain and suffering in the record of this case. An award for pain and suffering is not supported by the evidence.

55.

■ The facts of this case do not warrant the awarding of punitive damages under the Jones Act.

56.

■ Defendants are not entitled to a credit for the amount paid in settlement of the Greek judgment. Plaintiff's damages have already been reduced by the amount that Ioannis would have contributed to his mother, had he lived.

CONCLUSIONS OF LAW

1.

This court has jurisdiction of this cause; venue lies in this District and Division; and all parties are properly before this court.

2.

For the reasons stated in the court's Supplemental Memorandum and Order filed herein July 16, 1969, and by reason of the facts found herein, the marriage on March 18, 1966 between the plaintiff and Ioannis Biliris is valid in law, and the plaintiff is therefore his legal widow, entitled to sue on her own behalf for damages resulting from the death of Ioannis Biliris.

3.

The plaintiff's cause of action comes within the provisions of the Jones Act, 46 U.S.C.A. § 688 et seq. Hellenic Lines, Limited v. Rhoditis, 398 U.S. 306, 90 S. Ct. 1731, 26 L.Ed.2d 252 (1970).[2]

4.

■ Prerequisites of plaintiff's Jones Act recovery are (1) that the plaintiff is decedent's lawful widow, (2) that decedent was employed by one or more of defendants; (3) that decedent's employment was as a seaman on a vessel owned and operated by one or more of defendants and over which such defendant or defendants had command, and (4) that such defendant or defendants, or one over which they were responsible, was guilty of negligence, proximately causing the injury. 46 U.S.C.A. § 688 et seq. Neal v. Saga Shipping Co., 407 F.2d 481 (5th Cir. 1969); Savard v. Marine Contracting, Inc., 296 F.Supp. 1171 (D.C.Conn.1969).

2. Subsequent to the trial of this case, the United States Supreme Court, in Moragne v. States Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), held that death actions now lie under the general maritime law if death is caused by the violation of maritime duties (i. e., duty to provide a seaworthy vessel).

**5.**

For the reasons stated in the court's Supplemental Memorandum and Order filed and entered herein on July 16, 1969, and by reason of the facts found herein, the judgment pursuant to settlement entered into between the defendants herein and the decedent's mother, Maria Biliris (Finding of Fact Number 32), is entitled to no preclusive effect as to the plaintiff's cause of action or issues herein.

**6.**

Defendants are not entitled to a credit for the amount paid in settlement of the Greek judgment. Therefore, the amount of the Greek judgment is not to be deducted from the sum awarded to plaintiff in this case.

**7.**

The defendants, Hellenic Lines, Limited, Transpacific Carrier Corp. and Universal Cargo Carriers, are liable to the plaintiff for the injuries and death of Ioannis Biliris, deceased, proximately caused by and a consequence of the negligence and derelictions of the Boatswain aboard the S/S HELLENIC DESTINY on March 31, 1966. The defendants were not guilty of gross negligence in this case.

**8.**

A widow's recovery in an action brought for the recovery of damages resulting from the death of her husband, is limited to the amount her husband might reasonably have been expected to contribute to her had he lived. Sabine Towing Co. v. Biennan, 85 F.2d 478 (5th Cir. 1936), cert. den., 299 U.S. 599, 57 S.Ct. 191, 81 L.Ed. 441; Neal v. Saga Shipping Co., 407 F.2d 481 (5th Cir. 1969). In the present case, where the decedent is survived by a widow but not by children, the widow's recovery should be limited to 50% of decedent's lost earnings. See, Blackmon v. United States, 130 F.Supp. 498 (S.D.Ala.1955); Swanson v. United States, 229 F.Supp. 217 (N.D. Cal. 1964); Petition of Petro. Tankers Corp., 204 F.Supp. 727 (S.D.N.Y.1960); Brooks v. United States, 273 F.Supp. 619 (D.C.S.C. 1967); O'Connor v. United States, 269 F.2d 578, 583 (2d Cir. 1959).

**9.**

The portion of the recovery representing prospective losses should be reduced to the present value of the benefit that might reasonably have been expected from the decedent. O'Connor v. United States, 269 F.2d 578, 585 (2d Cir. 1958); Neal v. Saga Shipping Co., 407 F.2d 481 (5th Cir. 1969); Brooks v. United States, 273 F.Supp. 619, 623 (D.C.S.C.1967); Sabine Towing Co. v. Brennan, 85 F.2d 478 (5th Cir. 1936). In the present case, the court has concluded that a discount rate of 4½% should be applied to these prospective contributions.

**10.**

While the court recognizes that there is some authority indicating that the court may, in the proper exercise of its discretion, award prejudgment interest on wrongful death actions brought under the Jones Act, e. g., Petition of Midwest Towing Co., 203 F.Supp. 727 (E.D.Ill.1962), aff'd, Midwest Towing Co. v. Anderson, 317 F.2d 270 (7th Cir. 1963), this authority represents only a minority position. See, Annot., Wrongful Death—Prejudgment Interest, 96 A. L.R.2d 1104, 1112–15. The court has concluded that, at least in the present case, such prejudgment interest should not be allowed.

**11.**

By reason of the foregoing, plaintiff is entitled to judgment against defendants in the sum of $68,253.70; interest from the date of judgment at the rate of 6%, with costs of court being assessed against the defendants.